STATE of Missouri, Plaintiff–
Respondent,

v.

Brian Geoffrey MASSA, Defendant–
Appellant.

No. SD 31795.

Missouri Court of Appeals,
Southern District.

July 9, 2013.

Application for Transfer to Supreme
Court Denied July 31, 2013.

Application for Transfer Denied
Oct. 29, 2013.

Patricia Keck and Jason Coatney, Keck & Austin, L.L.C., Springfield, MO, for Appellant.

Chris Koster, Attorney General, and Karen L. Kramer, Assistant Attorney General, Jefferson City, MO, for Respondent.

GARY W. LYNCH, P.J., Opinion author.

Brian Geoffrey Massa ("Defendant") appeals his conviction for involuntary manslaughter in the first degree, *see* section 565.024, RSMo Cum.Supp.2008, claiming the trial court plainly erred in the admission of certain expert testimony and the submission of two jury instructions, the evidence was not sufficient to support his conviction, and the trial court prejudicially erred in excluding evidence of the victim's motive for his actions. Finding no error as claimed, we affirm.

### Factual and Procedural Background

The following evidence was adduced at Defendant's jury trial on the charge.

About 2:12 a.m., on March 28, 2010, Defendant, while on duty as an officer of the Southwest City Police Department, observed a Chevy Suburban that drifted over

the fog line. Defendant activated his police lights to pull over the vehicle and activated a camera on the dash of his police car. The Suburban turned into the parking lot of Seven Sons Mini–Storage and came to a stop. Within six seconds of bringing his police car to a stop with its headlights shining on the driver's door of the Suburban, during which time Defendant had just exited his police car, the Suburban took off at a high rate of speed. Defendant immediately returned to his vehicle and gave chase with police lights and sirens activated. Defendant also activated a body camera and microphone clipped to the front of his uniform shirt. Defendant pursued the Suburban from Highway 43 to Route PP to Frye Road. No other vehicles were encountered at any time during this chase or its aftermath.

The Suburban headed in a southeasterly direction on Frye Road with Defendant in pursuit. As the driver attempted to navigate a curve to the right, he lost control coming out of the curve, and the Suburban went off in the grass on the left (east) side of the road, overcorrected, spinning around about 270 degrees across the roadway, and ended up in the ditch on the other (west) side of the road, where it stopped momentarily. The Suburban then backed into a fence with its headlights facing back toward the road in a northeasterly direction and its front end sticking out slightly into the south lane of the road. As it began its spin across the road and into the ditch, Defendant came out of the same curve with his police car located on the east side of Frye Road and headed south. Defendant slightly angled his police car toward the location on the west side of the road where the Suburban was headed, thereby moving his police car into the southbound lane of the road. Defendant also began slowing down and then proceeded to simultaneously stop and exit his police car, while drawing his service weapon, as he approached the Suburban's location in the ditch. As Defendant was executing this joint maneuver and his police car was still moving slightly toward the Suburban, which was just coming to a stop, the Suburban almost immediately accelerated out of the ditch. At the same time the police car came to a stop, the Suburban's driver-side door came into contact with the left corner of the front bumper and headlight of the police car. The Suburban proceeded around and past the police car, headed in the opposite direction to the north where, approximately fifty feet north of the police car, it hit a concrete curb on a bridge and became high-centered. Meanwhile, Defendant, upon exiting his police car, fired two shots at the passenger compartment of the Suburban, paused for three to four seconds, and then fired two more shots at the passenger compartment. Defendant then reported over his police radio, "Shots fired. He hit my car."

Defendant walked up to the Suburban; the victim was slumped over in the driver's seat with his foot pressing down on the accelerator. Defendant reached in the front passenger-side door and shut off the engine. Defendant then returned to his vehicle, shut off its siren, and radioed his position. Defendant walked back to the Suburban and shined his flashlight in the window but did not say anything to the victim or try to assist him. Using his cellphone, Defendant texted a message to his fiancee's father, a McDonald County deputy sheriff, and told him that he needed him out on Frye Road. Defendant then shut off his body camera and tried to call his chief of police.

When Defendant reactivated his body camera, approximately three minutes later, he had moved the victim from the Suburban to the ground outside the vehicle. Defendant tried to get the victim to tell him

his name. Defendant told the victim an ambulance was coming.

That same night, Sergeant David Flanary and Deputy Richard Gidcumb, both of the McDonald County Sheriff's Department, were on a domestic-violence call when Gidcumb heard a call on the radio that Defendant was engaged in a pursuit in Southwest City. Gidcumb heard there had been a motor vehicle accident and shots were fired. Flanary and Gidcumb finished with the domestic-violence call and then went separately to Southwest City to provide backup because they had heard it was a pursuit and shots were fired. While en route, Flanary heard the coroner being called to the scene. Flanary knew that there was a wreck and that shots had been fired.

Flanary arrived on the scene first and met Defendant, who said he needed some latex gloves. Flanary gave Defendant some gloves and put on some himself. Defendant explained he had originally called for the coroner. Defendant said he could not tell how badly the victim was injured. They checked the victim, who was on the ground beside the Suburban on the driver's side. Flanary asked Defendant why he had been in pursuit, and Defendant said it was for a DWI. Defendant told Flanary he smelled alcohol when he tried to stop the victim initially. Flanary asked Defendant how many rounds he fired, and Defendant said he thought he fired four. Defendant said he fired the shots because the vehicle hit the front of his patrol car.

Officer Gidcumb then arrived and an ambulance followed. Flanary began taking pictures of the scene, including the location of tire tracks, shell casings, and damages to the vehicles. Two shell casings were found on the roadway southeast of the driver's door of Defendant's police car. Another shell casing was near the left front tire of the police car. There was damage to the bumper, headlight, and corner lens of Defendant's police car. Defendant showed a slug to Flanary and Gidcumb, which he said fell out of the Suburban when he opened the door to get the victim out. Defendant set it on the hood of the Suburban.

Sometime while on the scene and before he left to respond to another call, Officer Gidcumb saw Defendant bend down as if to pick up something from the middle of the road, about ten feet past the rear of the patrol car's bumper toward the Suburban. Gidcumb walked up behind Defendant and saw that he was holding a shell casing. Gidcumb thought nothing of it at the time, but he later became concerned when he heard talk in the days following the incident that there was a missing shell casing. Gidcumb reported the incident to his sergeant, who directed him to document the incident, which Gidcumb did. Normally, unless one is the investigator for the incident, officers are taught to leave things alone for fear of contaminating the crime scene.

Flanary also took pictures of the right side of the Suburban, as there were broken windows on that side of the vehicle, and there appeared to be some bullet holes.

Chris Owens, another McDonald County sheriff's deputy, was completing reports after hours when he heard a radio report that Defendant was involved in a vehicular pursuit after attempting to make a traffic stop. Owens went to back-up Defendant. As Owens proceeded to the scene, Defendant advised that the vehicle had been involved in an accident, there were shots fired, and his vehicle had been hit. Specifically, Defendant said, "Shots fired. He hit my car." Owens thought Defendant meant that someone had been shooting at him.

Owens arrived on the scene about 2:30; Flanary and Gidcumb were already on the scene, and EMTs were also on scene to assist the victim. Owens checked to make sure Defendant was all right and then helped the EMTs load the victim into the ambulance.

Owens, believing that the victim had had a weapon, asked Defendant where the weapon was, and Defendant explained there was no weapon, but his police car had been struck by the Suburban. Defendant said he was in the doorway of his police car when the Suburban hit his car. Owens asked Defendant how many rounds he fired and then recovered the magazine from Defendant's gun, which revealed that four shots had been fired. Owens took possession of Defendant's gun and his body camera. Owens eventually turned these items over to the highway patrol. Owens located two shell casings toward the center of the roadway.

Missouri State Highway Patrol Trooper Randy Morris received a call to go to the scene of an "officer of the law shooting." Morris arrived on the scene about 3:00 a.m. and was told that Defendant was involved in the shooting. Morris had Defendant get in his vehicle so they could speak. Morris asked Defendant if he was injured, and Defendant said, "No, I'm fine." Defendant appeared to be calm; he had been smoking a cigarette before getting into Morris's vehicle. Morris asked Defendant what had happened. Defendant said that he attempted to stop a vehicle in Southwest City for a lane violation. As he exited the patrol car and walked toward the vehicle, he could smell alcohol, so he knew that the driver was intoxicated. The driver fled the scene, and Defendant returned to his vehicle and gave pursuit. Defendant said that as he pursued the vehicle down Frye Road, the driver lost control off the left side of the roadway, then crossed back over to the right side of the roadway, where he again lost control. The driver regained control of the vehicle and started coming back toward the patrol car, striking the front end of the patrol car. Defendant said he then got out of his patrol car and fired four or five shots at the car.

James Musche of the Division of Drug and Crime Control of the Missouri State Highway Patrol conducted an investigation of the shooting. When Sergeant Musche arrived on the scene, he met first with Trooper Morris, who gave him a synopsis of the information he had obtained, and then Musche made an initial walk-through at the scene. Musche interviewed Sergeant Flanary and Deputy Owens, since they were the first responders to the scene. Musche observed three .45–caliber shell casings on the roadway. A lead slug and a lighter were on the hood of the Suburban. There was damage to the left side of the front bumper and left front headlight of the police car. A bloody hat was outside of the Suburban on the shoulder of the road. The Suburban had damage on its driver's side between the front and rear doors from contact with the police car. There were apparent bullet holes in the right rear cargo window and the right rear door window. One bullet had passed through the headrest and seatbelt of the front passenger seat of the Suburban. That same bullet struck the indoor trim of the right front door of the Suburban. A piece of the copper jacket from a bullet was embedded in the right side of the driver's seat. That bullet had traveled through the right rear door window and into the right side of the driver's seat. There was a bloodstain on the interior of the driver's door. A projectile was recovered from under the carpet on the rear floor of the Suburban, directly behind center console.

Sergeant Musche next met with Defendant. The interview was recorded, admitted into evidence, and played for the jury. Defendant told Musche the following. He was getting out of his car and perhaps was out of the vehicle when the Suburban hit the front of his patrol car. He thought he was drawing his weapon as he got out of the car. He fired after the Suburban struck his car. He fired twice; he said he was in the doorway of his police car but could not remember if he was out or was getting out. He fired two more times. He shot at the vehicle because it was driving toward the open door of his police car, where he was standing, and he felt that the Suburban was going to strike him. The driver's door of the police car was open the entire time. He fired into the driver's compartment of the Suburban as it was heading toward him. He aimed his shots at the driver's compartment. Approximately a second or half a second elapsed between the first two shots and the last two shots. When he fired the last two shots, the victim was "even with him[,]" and Defendant was looking at the driver's window, which was door-to-door with his police car. All four shots went into the driver's side of the Suburban. He thought he was standing for the shots. He did not recall firing any shots at the Suburban after it passed him. He recalled the shots occurred right after the Suburban hit the bumper and then as it passed by Defendant. After the final two shots, he turned to get back in his vehicle, and that was when he heard the crash. He went up to the vehicle, saw the victim bleeding and slumped over, and he reached in the front passenger door and turned off the engine.

He then called for an ambulance and also called for the coroner. He tried calling his chief of police but could not reach him. When he saw the victim move, he removed him from the vehicle. He then called dispatch and told them to expedite the ambulance. The original violation was for a lane violation and possibly a drunk driver. He had not seen any other vehicles for thirty minutes before he saw the Suburban.

Sergeant Musche asked Sergeant Brian Gruben of the Missouri Highway Patrol Major Crash Investigation Unit to prepare scaled diagrams of the collision scene. Sergeant Gruben found that the Suburban came to rest hanging over a concrete bridge,[1] with the left rear tire hanging in the air. Defendant's police car was parked on the side of Frye Road. The left front tire of the police car was approximately fifty-three feet from the rear of the Suburban. The left rear tire of the police car was about forty-four feet from the rear of the Suburban. Sergeant Gruben spotted shell casings on the road and mapped their location on the road; two were across the road from the front wheel of the police car; one was next to the left front wheel of the police car. Sergeant Gruben observed that the first set of tire marks showed the Suburban coming around the curve of Frye Road; a faint lateral tire mark indicated that the vehicle was taking the curve too fast. The tires on the driver's side of the Suburban went off of the road into the grass. As the vehicle was partially in the ditch and partially on the roadway, the driver steered to the right to bring the vehicle back onto the roadway. The driver overcorrected, and the vehicle started to

1. This was a small bridge with no sides other than a concrete curb or rail (sometimes also referred to as an abutment in the testimony) protruding above the road elevation. Some witnesses referred to the bridge as a culvert. Because Sergeant Gruben referred to it as a bridge in his drawings, and there is another structure in his drawings identified by him as a culvert, we will refer to the structure upon which the Suburban came to its final rest as a bridge.

rotate, going down the road sideways. The vehicle then entered the ditch on the other side of the road with its rear-end first. Tire marks then indicated that the Suburban was driven out of the ditch and around the police car. There was no evidence of any damage to the driver's door of the police car. The front right side of the Suburban hit a bridge, the rear-end of the vehicle rotated clockwise, and the vehicle slid across the bridge rail until it came to a stop with the left rear tire losing contact with the ground. The right side of the vehicle was not exposed to the police car until it struck the bridge, which would have been immediately before the Suburban came to its final rest. There was no evidence that the vehicle was attempting to turn around and head back toward the police car. The wheels were canted to the left, indicating an attempt to correct a skid and return to the road, not to the right, which would be the expected maneuver had the driver intended to drive toward the police car.

Several of Sergeant Grubens' drawings were admitted into evidence and shown to the jury. State's Exhibit 13, set forth below, illustrates his testimony about the Suburban's dynamics and showed both vehicles in their final positions.

Sergeant Gruben explained that the Suburban reached its final resting place because, as it was traveling north, the front of the vehicle struck the concrete bridge, causing the right front corner to decelerate, resulting in the Suburban rotating in a clockwise manner. The vehicle maintained enough forward momentum so that it "climbed up on top" of the concrete and slid to a stop as it rotated clockwise and high-centered on top of the bridge.

Sergeant Gruben indicated that after clipping the front headlight and bumper of the police car, the Suburban was arcing away from the police vehicle. The Suburban was approximately 4.3 feet from the A pillar of the police car (where the windshield intersects with the roof), 4.8 feet from the B pillar of the police car (the pillar between the front door and rear door), and 4.9 feet from the C pillar (where the rear window and roof intersect). The Suburban was a few feet from hitting the

driver's door of the police car even with that door fully open. The road was approximately eighteen feet wide.

An autopsy of the victim, Bobby Stacy, revealed a bullet hole through the scalp and skull above his right ear. The bullet went through the brain on the right side and then appeared to have bounced off of the inside of the front of the skull, with the bullet fragments coming to rest inside the brain. Two bullet fragments were removed from the front of the right side of the brain. The track of the bullet was from back to front, from right to left, and very slightly upward. Stacy died as a result of the gunshot wound to his head.

According to Sergeant Musche, review of the bullet holes in the vehicle revealed that the first two shots entered the left rear door of the Suburban, and the bullets travelled from the rear of the vehicle toward the front. The first shot entered through the rear speaker in the left rear door and hit the floor, coming to rest at the center of the back of the center console. The second shot entered through the left rear window. That shot passed from back to front through the vehicle, through the headrest and then the seat belt of the front passenger seat, and into the right front door.

The last two shots came in through the right side of the vehicle. One shot came in through the right rear cargo window. The bullet went in toward the top of the cargo window and struck the headliner and interior roof of the Suburban.

The other shot entered the vehicle through the right rear door window, and it was this shot that struck the victim in the head. The last two shots were fired and struck the Suburban after it struck the bridge. The final shot was fired after the vehicle was disabled, and the wheel was spinning because it was up and off of the roadway.

According to Sergeant Musche, all three shell casings had been fired from Defendant's weapon. The projectiles found on the hood of the Suburban and the floor of the rear passenger area also could have been fired from Defendant's gun.

Upon reviewing the ballistics evidence and the videos from the dash-camera and Defendant's body camera, Sergeant Musche found that Defendant's statement in the first interview did not match the physical evidence. On April 6, 2010, Defendant voluntarily went to the highway patrol's satellite office in Carthage to be interviewed again. The interview was recorded, admitted into evidence, and played for the jury.

Defendant stated the following to Musche during that interview. He shut off his body camera because he wanted to have a private conversation with his chief of police, which he did not want recorded. The camera was off for three minutes. He did not want anything he said to be misconstrued. He believed his police car was in park when the Suburban hit it. He was getting out of the vehicle when the Suburban pulled out of the ditch. He did not remember drawing his gun, but he was probably drawing it as he was getting out of his car. He was not aware of anyone moving a shell casing. The Suburban was coming toward his patrol car when he fired the first two shots from the area of his driver's door into the driver's compartment of the Suburban. A short period of time elapsed, and then he fired two additional shots as the vehicle came by him and both vehicles were "door to door[.]" All of the shots were fired from the driver's door of the police car. He did not think he chased the vehicle on foot. In response to Musche explaining the bullet defects found in the Suburban and the trajectories, including the fatal shot

through the right rear door window, Defendant did not remember firing from an adjoining yard. Similarly, in response to Musche asking if he had advanced past the bumper of his car or taken a position off to the right side of the road before firing the final shots, Defendant said he did not go into the yard; he might have gone toward the bumper, but as he recalled, the shots were fired from the driver's door. He did not remember a time gap of four seconds between the first pair and second pair of shots. He might have been toward the rear bumper, but he did not recall crossing to the right side of the road at all. The projectile Defendant found was on the Suburban's driver's door running board. He took the lighter from the victim because the victim kept trying to light a non-existent cigarette. He did not mention anything indicating that he thought that after the Suburban went by him, the driver was turning around and trying to come back at him.

Sergeant Musche further testified that the Southwest City police policy on use of lethal force provides that an officer should shoot at a vehicle only as a last resort even when the suspect refuses to obey the command of an officer. He also testified that Defendant did not follow proper police procedure in (1) pulling his police car up so close to the Suburban in the ditch, (2) getting out of the police car when a danger was coming toward him, (3) shooting at the Suburban when it was past Defendant's location, and (4) shooting at the Suburban once it was hung up on the bridge. Proper police procedure would have dictated, respectively, (1) keeping the police car at a safe position back from the Suburban, (2) taking cover in the police car to protect Defendant's body from being struck by the Suburban, (3) ceasing the assault on the Suburban once the threat was past Defendant, and (4) approaching the Suburban hung up on the bridge from a position of cover and calling for back-up.[1]

Defendant made a written report of the incident a week after his second interview with Sergeant Musche. In his report, Defendant stated the following. As he was exiting his patrol vehicle, the Suburban accelerated and turned left toward his police car. The Suburban struck his car, and the driver continued to turn the Suburban toward him. He was in the door area of his police car. He shot twice into the driver's compartment of the Suburban and then re-aimed and shot two more times. He next got back into his patrol car, and it was then that he heard the Suburban crash down the road. Nowhere in the report did he suggest that he had smelled alcohol on the driver of the vehicle. Defendant never said, either in any of his interviews or in his report, that he shot at the car because he though victim was a dangerous drunk or he might hurt someone else on the road.

At the conclusion of the guilt phase of the trial, the jury found Defendant guilty of involuntary manslaughter in the first degree as charged. Following the sentencing phase of the trial, the jury recommended a sentence of three years in the Department of Corrections. The trial court followed the jury's recommendation and imposed sentence accordingly. This appeal timely followed.[2]

### Discussion

Defendant raises five points on appeal. We address them out of the order presented for ease and clarity of analysis.

---

2. During the pendency of this appeal, Defendant filed two motions to remand the case to the trial court, which were ordered taken with the case. Finding no merit in either motion, we deny both.

## Plain Error Review of Sergeant Gruben's Testimony Waived by Defendant

 In his fourth point, Defendant claims "the trial court erred in admitting the testimony of Sergeant Brian Gruben relating to the location/position of the Suburban because ... such opinion testimony invades the province of the jury." The closest Defendant comes to identifying the specific testimony that he claims the trial court erroneously admitted is his statement that "Sergeant Gruben was allowed to testify as to the 'dynamics' or the location of the suburban at various times throughout this sequence when [victim] was fleeing and when [Defendant] was firing his service weapon." Defendant concedes, however, that at no point during this testimony did he lodge an objection on the ground that it invaded the province of the jury. Acknowledging that this alleged error was not properly preserved for appellate review by raising a timely, specific objection to it, Defendant requests plain error review under Rule 30.20.[3] We deny that request, because Defendant has waived plain error review of this challenged testimony.

An objection to the admission of evidence must be made to preserve the issue for appeal. Plain error review would apply when no objection is made due to inadvertence or negligence. Plain error review is waived when counsel has affirmatively acted in a manner precluding a finding that the failure to object was a product of inadvertence or

negligence. Plain error review does not apply when a party affirmatively states that it has no objection to evidence an opposing party is attempting to introduce[.]

*State v. Johnson*, 284 S.W.3d 561, 582 (Mo. banc 2009) (internal citations and quotation marks omitted). In other words, where a defendant affirmatively represents to the trial court that he or she has no legal basis upon which to object to the admission of proffered evidence, the defendant cannot later assert on appeal that the trial court was nevertheless required to *sue sponte* reject such evidence.

 Here, before Sergeant Gruben testified, Defendant stipulated on the record to the admission into evidence of Exhibits 9 through 13, the five scaled diagrams of the scene on Frye road prepared by Sergeant Gruben.[4] During Sergeant Gruben's testimony, after he identified these exhibits as the diagrams he prepared, the State offered them into evidence along with "blow-ups" of each, labeled Exhibits 9–a through 13–a, respectively, to which Defendant's trial counsel responded, "No objection." Exhibits 12, 12–a, 13 (reproduced *supra*), and 13–a[5] purport to show the "dynamics," i.e. the location and position, of the Suburban as it moved from the point when it initially began exiting the ditch until it came to final rest on the bridge. Sergeant Gruben used these exhibits to illustrate to the jury his testimony describing the Suburban's dynamics, and that testimony was consistent with the information depicted on the exhibits he had

---

3. All rule references are to Missouri Court Rules (2013).

4. The following exchange confirming the stipulation occurred between Defendant's trial counsel and the prosecuting attorney:

[Defendant's trial counsel]: ... Now this 9 through 13 that I just stipulated to, those are the Gruben diagrams, right?

[Prosecuting attorney]: Yes....

5. Exhibit 13 is a "zoomed in" version of Exhibit 12 and, apparently, Exhibits 12–a and 13–a are further enlargements of each, so that all four exhibits are the same diagram in varying degrees of enlargement.

prepared. Sergeant Gruben then used the Suburban's dynamics, as shown on these exhibits, to support his opinion that the first point in time when the right passenger side of the Suburban would have been exposed to the police car during this sequence of events was when the Suburban struck the bridge or shortly thereafter.

Exhibits 12, 12–a, 13 and 13–a embodied and illustrated Sergeant Gruben's testimony as to the location and position of the Suburban during the relevant time period. Defendant's stipulation to the admission of these exhibits and his trial counsel's statement of "No objection" to their admission are affirmative acts precluding a finding that Defendant's failure to object to Sergeant Gruben's location and position testimony on the basis now asserted on appeal was "a product of inadvertence or negligence." *Id.* Rather, those affirmative acts toward admission serve as a waiver of any plain error review of that testimony. *See Id.* For this reason, Defendant's fourth point is denied.

### *Plain Error Review of Sergeant Musche's Testimony Not Supported by Argument*

■ Defendant's fifth point asserts that the trial court erred "in admitting the testimony of Sergeant Jamie Musche relating to the location/position of the Suburban at the time shots three and four were fired from [Defendant's] service weapon because . . . such opinion testimony invades the province of the jury." Defendant identifies the challenged testimony as the following:

Q [By the Prosecuting Attorney] Finally, did you come to a conclusion based on your training and experience about where the Suburban was, looking at 13–a there, where the Suburban was on Frye Road when those last two shots were fired?

A [By Sergeant Musche] Yes.

Q And what's your opinion?

A Those two shots were fired and struck the vehicle after it had impacted the [bridge].

Q When it's sitting in its final resting place?

A I don't know about if I can say stopped, but it was after it changed direction due to the impact of the [bridge].

Q And did you reach an opinion about at what—what the Suburban was doing between the third and the fourth shot?

A Yes.

Q And what's your opinion?

A The engine can be heard revving.

Q Between the third and the fourth shot?

A Yes.

Q So the fourth shot, in your opinion, was fired after the vehicle was disabled and the wheel was spinning off the roadway?

A Yes.

■ As shown above and as conceded by Defendant, however, at no point during this testimony did he lodge an objection on the ground that it invaded the province of the jury. Acknowledging that in the absence of a timely specific objection, this alleged error was not properly preserved for appellate review, Defendant requests plain error review under Rule 30.20.

Rule 30.20 is no panacea for unpreserved error, and does not justify review of all such complaints, but is used sparingly and limited to error that is evident, obvious, and clear. Not all prejudicial error—that is, reversible error—can be deemed plain error. A defendant's Rule 30.20 burden is "much greater"—not merely to show prejudice, but manifest injustice or a miscarriage of justice—

which in this context means outcome-determinative error.

We are not required to review for plain error; to do so is within our discretion. The two-step analysis is (1) did the trial court commit evident, obvious, and clear error affecting the defendant's substantial rights; and (2) if so, did such plain error actually result in manifest injustice or a miscarriage of justice? Unless a defendant gets past the first step, any inquiry should end.

*State v. Smith*, 293 S.W.3d 149, 151 (Mo. App.2009) (internal citations and quotation marks omitted). "The defendant bears the burden of showing that an alleged error has produced such a manifest injustice. Mere allegations of error and prejudice will not suffice." *State v. Garth*, 352 S.W.3d 644, 652 (Mo.App.2011) (citing *State v. Isa*, 850 S.W.2d 876, 884 (Mo.banc 1993)). " 'The determination [of] whether plain error exists must be based on a consideration of the facts and circumstances of each case.' " *State v. Scurlock*, 998 S.W.2d 578, 586 (Mo.App.1999) (quoting *State v. Cline*, 808 S.W.2d 822, 824 (Mo. banc 1991)).

■ We decline to exercise our discretion to engage in plain-error review on this point, because to do so would require us to become an advocate for Defendant. Defendant does not address either the manifest injustice or the miscarriage of justice requirement of plain-error review in his point. Outside of his recital of the plain-error standard of review, Defendant does not mention either requirement in his argument supporting this point other than to state "the admission of Sgt. Musche's opinion testimony as to the location of the suburban at the time that [Defendant] fired his weapon, has caused [Defendant] to suffer a manifest injustice requiring reversal of the conviction and judgment herein[,]" and "[t]he admission of such tes-

timony is manifest injustice and requires reversal herein." Both statements are nothing more than mere allegations of prejudice and do not suffice to support a claim of plain error. *See Garth*, 352 S.W.3d at 652. A plain-error analysis requires an examination of the facts and circumstances of the case that arguably give rise to a manifest injustice or miscarriage of justice determination. *See Scurlock*, 998 S.W.2d at 586. If we were to engage in a manifest-injustice or miscarriage-of-justice analysis, in the absence of Defendant providing us such an argument in his brief, we would have to scour the record and devise arguments on his behalf, thereby becoming his advocate. This is not an appropriate function for an appellate court, *State v. Conaway*, 912 S.W.2d 92, 96 (Mo.App.1995), and is something we cannot and will not do, *State v. Bell*, 266 S.W.3d 287, 290 (Mo.App.2008) ("This court will not act as an advocate by scouring the record for facts to support Defendant's contentions"). Defendant's fifth point is denied.

### No Plain Error Review of Instructions Requested by Defendant

■ Defendant's first point claims that the trial court erred in submitting Instructions numbered 10 and 11 to the jury. Defendant asserts that Instruction Number 10, submitting self-defense, should have been included in Instruction Number 11, which submitted the defense of law enforcement officer justification under section 563.046, RSMo 2000, and Instruction Number 11 did not properly submit that defense. The trial court submitted both instructions to the jury in the form as tendered and requested by Defendant. Conceding that these instructions were submitted to the jury by the trial court at his request and without any objection from him, Defendant now seeks plain error review.

Relying upon *State v. Bolden*, 371 S.W.3d 802 (Mo.banc 2012), the State claims that by requesting the submission of these instructions, Defendant has waived any claim of error, including plain error, as to their submission. We agree.

In *Bolden*, the state and the defense jointly submitted a defective defense-of-others instruction. *Id.* at 805. Our Supreme Court noted that "the proffering of an incorrect instruction to the trial court is an invited error by the party who proffered the instruction. It defies logic and the clear directives of Missouri law to allow a defendant to both proffer an instruction to the trial court and to complain that the trial court's submission of that instruction to the jury is reversible error." *Id.* at 806. It concluded that "Defendant waived appellate review by proffering the instruction of which she now complains. This Court declines to use plain-error review to impose a *sua sponte* duty on the trial court to correct erroneous instructions proffered by the complaining party." *Id.*

Defendant's arguments in his reply brief attempting to distinguish this case from *Bolden* are not persuasive. First, he claims that because the form and substance of the instructions he requested were required by MAI–CR3d, he has not waived plain-error review. This alleged distinction misses the mark. The basis for the holding in *Bolden* was invited error. The invitation to such error is in the request to submit a particular instruction to the jury, not in the source for the content of that instruction. "Whenever there is an MAI–CR instruction or verdict form applicable under the law and Notes On Use," the trial court is required to submit that form to the jury. Rule 28.02(c). Nothing in Rule 28.02, however, requires a defendant to request the trial court to submit a MAI–CR instruction form that the defendant does not believe is applicable under the law. *See* Rule 28.02(a)-(d).[6] Indeed, Rule 28.02(b) explicitly anticipates that a party may request the giving of "Modified" and "Not in MAI–CR" instructions. Rule 28.02(b). Defendant's affirmative request to the trial court to submit Instructions 10 and 11, which Defendant has continually claimed are in accordance with MAI–CR instruction forms 06.06(a) and 306.14 modified by 333.00, respectively, not only invited the trial court to commit error should it later be determined that the MAI–CR forms were not in accordance with Missouri law, as now argued by Defendant,

6. Rule 28.02(a)-(d) provides:

(a) **Duty of Court.** In every trial for a criminal offense the court shall instruct the jury in writing upon all questions of law arising in the case that are necessary for their information in giving the verdict.

(b) **Request for Instructions and Verdict Forms.** At the close of the evidence, or at such earlier time as the court may direct, counsel shall submit to the court instructions and verdict forms that the party requests be given. Instructions and verdict forms that a party requests shall be submitted in writing with an original and one copy for the court and one copy for each party. Each copy shall contain a notation at the end of the instruction as follows: "MAI–CR ——", "MAI–CR ——, Modified", or "Not in MAI–CR ——", as the case may be.

(c) **MAI–CR Excludes Use of Other Forms.** Whenever there is an MAI–CR instruction or verdict form applicable under the law and Notes On Use, the MAI–CR instruction or verdict form shall be given or used to the exclusion of any other instruction or verdict form.

(d) **Guide for Form of Instruction Where MAI–CR Not Applicable.** If an MAI–CR form must be modified or if there is no applicable MAI–CR form, the modified form or the form not in MAI–CR, if given, shall be simple, brief, impartial, and free from argument. It shall not submit detailed evidentiary facts. All instructions, where possible, shall follow the format of MAI–CR instructions, including the skeleton forms therein.

but actually enticed the trial court to do so because of its Rule 28.02(c) requirement to use the MAI–CR forms, if applicable under the law.

Second, Defendant asserts that *Bolden* should not apply here because "at the time [Defendant's] trial attorneys submitted Instruction 11, *State v. Beck,* 167 S.W.3d 767 (Mo.App.2005)[7] was controlling. (Holding error in self-defense instruction constituted plain error)." Defendant, however, after making this assertion, does not develop it with any citation to legal authority or supporting argument, never mentioning *Beck* again in his reply brief. If we were so inclined, which we are not because doing so would require us to become an advocate for Defendant, *see* discussion *supra,* crafting an argument based upon Defendant's trial counsel's reliance upon *Beck* in requesting submission of Instruction 11 in the first instance without impugning trial counsel's motives, would be difficult, if not impossible. We have no reason to question those motives. Defendant's assertion that *Beck* is controlling, unsupported by citation to any legal authority or any argument, is not persuasive.

Defendant's first point is denied.

### Evidence was Sufficient to Support Conviction

In his third point, Defendant asserts that the trial court erred in overruling his motion for judgment of acquittal at the close of all the evidence because "there was insufficient evidence presented to prove that [Defendant] recklessly caused the death of Bobby Stacy." Defendant claims this is so for two reasons: "no reasonable juror could find from the evidence presented that [Defendant] was not legally justified in his attempt to arrest Bobby Stacy and the weight of the evidence does not support that [Defendant] acted recklessly in the use of deadly force."

When considering the sufficiency of the evidence on appeal, this Court must determine whether sufficient evidence permits a reasonable juror to find guilt beyond a reasonable doubt. The evidence and all reasonable inferences therefrom are viewed in the light most favorable to the verdict, disregarding any evidence and inferences contrary to the verdict. This is not an assessment of whether the Court believes that the evidence at trial established guilt beyond a reasonable doubt but rather a question of whether, in light of the evidence most favorable to the State, any rational factfinder could have found the essential elements of the crime beyond a reasonable doubt. In reviewing the sufficiency of the evidence supporting a criminal conviction, an appellate court does not act as a super juror with veto powers, but gives great deference to the trier of fact.

*State v. Wright,* 382 S.W.3d 902, 903 (Mo. banc 2012) (internal quotation marks and citations omitted). " '[T]his Court will not weigh the evidence anew since the factfinder may believe all, some, or none of the testimony of a witness when considered with the facts, circumstances and other testimony in the case.' " *State v. Nash,* 339 S.W.3d 500, 509 (Mo. banc 2011) (quoting *State v. Freeman,* 269 S.W.3d 422, 425 (Mo. banc 2008)). "The function of the reviewing court is not to reweigh the evidence, but only to determine whether the judgment is supported by sufficient evidence." *State v. Loughridge,* 395 S.W.3d 605, 607 (Mo.App.2013) (citing *State v. Burse,* 231 S.W.3d 247, 251 (Mo.App. 2007)).

7. *Bolden* overruled *Beck. Bolden,* 371 S.W.3d at 806.

■ As this Court has recently observed, a claim of insufficient evidence analytically involves three sequential steps:

1. Identify a challenged factual proposition needed to sustain the conviction;

2. Identify all favorable evidence in the record tending to prove that proposition; and

3. Show why such evidence, when considered along with its reasonable inferences, is so non-probative that no reasonable fact-finder could believe the proposition.

*State v. Finch*, 398 S.W.3d 928, 929 (Mo. App.2013).

■ Defendant's argument on this point initially proceeds by asserting that based upon Defendant's version of events—"Stacy intended to use the suburban to plow through the patrol car and [Defendant]" when Defendant fired the four shots—a reasonable juror could not find beyond a reasonable doubt that Defendant's actions in shooting into the passenger compartment of the Suburban were reckless and that his use of deadly force in this manner was not justified. This argument's reliance on evidence contrary to the verdict—Defendant's statements—has no persuasive force because it provides no logical support for Defendant's insufficient-evidence claim. Our standard of review requires us to disregard all evidence contrary to the verdict, *Wright*, 382 S.W.3d at 903, which makes such evidence fall outside of the analytical framework of a cogent insufficiency-of-the-evidence argument, *Finch*, 398 S.W.3d 928, 928–29.

Defendant then turns to Deputy Gidcumb's testimony regarding the missing bullet casing and the expert testimony of Sergeants Gruben and Musche, tacitly acknowledging and identifying this testimony as favorable evidence supporting both propositions of recklessness and lack of justification. Defendant makes no argument, however, that their testimony, if believed by the jury, is non-probative on those issues. *See id.* Rather, Defendant confines his arguments solely to each witness's lack of credibility and why the jury could not have believed his testimony to reach its verdict. This argument also lacks any persuasive force because our standard of review requires this Court to defer to the fact-finder on witness-credibility issues, as the fact-finder may believe all, some, or none of the testimony of any witness. *Nash*, 339 S.W.3d at 509. Witness-credibility arguments simply have no place and serve no logical purpose within the analytical framework of an insufficiency-of-the-evidence claim. *See Finch*, 398 S.W.3d 928, 928–29.

■ This is true for expert witness testimony as well as for fact witness testimony. This Court will not "reweigh the evidence and second-guess" a fact-finder's factual conclusion that was supported by expert testimony. *Nash*, 339 S.W.3d at 511 (quoting and citing *State v. Hampton*, 959 S.W.2d 444, 450 (Mo. banc 1997)). As the Western District of our Court has noted,

> There is a distinction between whether an expert witness's testimony is admissible and whether a submissible case has been made while relying on the expert's testimony. If a question exists as to whether an expert witness's opinion testimony is supported by a sufficient factual or scientific foundation, the question is whether the expert witness's testimony is admissible. It must be raised by a timely objection or motion to strike. Once the testimony has been admitted, it may be relied upon for purposes of determining whether a submissible case has been presented. The jury decides what probative value, if any, the testimony carries.

*State v. Jackson,* 186 S.W.3d 873, 883 (Mo. App.2006) (internal quotation marks and citations omitted).

■ Here, the testimony of Sergeants Gruben and Musche was sufficient for a reasonable juror to find beyond a reasonable doubt that Defendant's conduct—intentionally firing four shots into the passenger compartment of the Suburban after it had already passed the point when it could have hit either the police car or Defendant, with the last two shots occurring after the Suburban had hit the bridge almost fifty feet north of the police car and the last shot occurring after the Suburban became high-centered on the bridge—was reckless and without justification. Defendant offers no argument, consistent with our standard of review, otherwise. *See Finch,* 398 S.W.3d 928, 929. Point denied.

### No Abuse of Discretion in Exclusion of Evidence

Before trial, the trial court sustained the State's motion in limine to exclude any specific bad acts or reputation evidence of the victim that was not considered by Defendant at the time he tried to stop or arrest the victim. During a break in Sergeant Musche's testimony and out of the jury's presence, Defendant made an offer of proof that, if allowed by the trial court, Sergeant Musche would testify that later in the morning, after the incident where Defendant shot the victim, the Suburban and a backpack in the Suburban were reported as having been stolen. Sergeant Musche had no knowledge, information, or witnesses supporting that victim had stolen either item. During his offer of proof, Defendant conceded that at the time of the shooting, he had no knowledge that either item was reportedly stolen. The trial court denied the admission of the testimony as not being logically relevant because the victim's state of mind was not at issue,

and what was relevant was Defendant's "perception of what was going on."

Defendant's second point asserts that the trial court abused its discretion in excluding Sergeant Musche's testimony about the Suburban and the backpack being reported stolen because "evidence of another crime is admissible if it tends to establish intent and motive[,]" in that Officer Musche's testimony "was relevant to show [the victim's] motive for escape and intention to cause serious physical injury to [Defendant] in order to evade arrest when [the victim] drove his vehicle directly at [Defendant]." We disagree.

■ "Trial courts retain broad discretion over issues of relevancy and admissibility of evidence, and those decisions will not be interfered with unless there is a clear showing of abuse of discretion." *State v. Tokar,* 918 S.W.2d 753, 770 (Mo. banc 1996). "Evidence will be relevant as long as it 'logically tends to prove or disprove a fact in issue.' " *Id.* (quoting *State v. Hill,* 817 S.W.2d 584, 587 (Mo.App.1991)).

> A trial court abuses its discretion when its ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration. If reasonable persons can differ as to the propriety of the trial court's action, then it cannot be said that the trial court abused its discretion.

*State v. Taylor,* 134 S.W.3d 21, 26 (Mo. banc 2004).

■ Defendant claimed to the trial court and now claims on appeal that admission of Officer Musche's testimony would support "the fact that [the victim] had stolen the suburban" and would have allowed Defendant "to show [the victim's] motives in evading capture." While we are dubious that the excluded testimony

supports the fact that the victim "had stolen the suburban," we need not address that issue. This is so because even if true, Defendant was not aware of that fact at the time he fired the four shots, and Defendant has failed to identify any element of the charged crime or his asserted defenses of self-defense and law enforcement officer justification that makes the victim's state of mind (motive) a fact in issue for the jury to determine.

Defendant first asserts that he "was forced to demonstrate that [the victim] had committed a crime in order to justify his defense." Obviously, Defendant was well aware by observation that the victim had committed the crime of resisting arrest. On the other hand, even if the victim had stolen the Suburban, the Defendant's admitted lack of knowledge of that fact at the time he fired at the Suburban deprives Defendant of the ability to show he relied upon that crime to justify his shooting into the passenger compartment of the Suburban.[8]

Defendant next asserts that *State v. Caldwell*, 695 S.W.2d 484 (Mo.App.1985), supports the admission of Sergeant Musche's testimony. It does not. In *Caldwell*, the defendant was charged with first-degree assault based upon his alleged attempt to run down a police officer with the car he was driving. *Id.* at 485. Caldwell was driving a car he knew to be stolen when he heard the siren of an approaching police car. *Id.* A high-speed chase ensued. *Id.* Officer Shoemake, the victim in the case, blocked the curb lane to set up a road block and then stood at the side of his car. *Id.* As Caldwell approached the blocked intersection, he swerved his car directly toward Officer Shoemake, who drew his service revolver and fired one

shot at the front windshield. *Id.* The car driven by Caldwell suddenly swerved, barely missing Officer Shoemake, and then struck the grass median and was stopped by running into several trees. *Id.* Caldwell was arrested and told Officer Shoemake, "You are lucky, man. I was going to run your f——g ass over." *Id.* At trial, Caldwell testified that he did not intentionally swerve toward Officer Shoemake but rather ducked under the dashboard when he saw the officer point a gun at him. *Id.*

Caldwell argued that the trial court erred in allowing the state to introduce evidence that he was driving a stolen car and had allegedly been tampering with a car. *Id.* at 485–86. The Eastern District of this Court found no error, noting that evidence of another crime is admissible if it tends to establish intent or motive. *Id.* at 486. The Court found that the evidence was relevant to show Caldwell's motive in trying to run down the police officer. *Id.*

While *Caldwell* addresses a factual situation very similar to the instant case before us, the relevant actors are in different positions before the court. There, the driver of the vehicle directed toward the law enforcement officer was the defendant charged with a crime, and the law enforcement officer was the alleged victim. Here, the law enforcement officer is the defendant charged with a crime, and the driver of the vehicle directed toward the law enforcement officer is the alleged victim. While the state of mind of the defendant is a fact issue for the jury to determine in both cases, nothing in *Caldwell* suggests, much less supports, that the state of mind of the alleged victim is a fact issue for the jury to determine and is therefore relevant. Defendant's extensive reliance upon

8. As the State points out in its brief, "the worst criminal in all of history could drive by a police officer, but if the police officer did not know that the individual had committed a crime, the police officer would not be justified in opening fire."

*Caldwell* in support of this point is misplaced.

Defendant's arguments fail to persuade us that the trial court's exclusion of Sergeant Musche's testimony was "clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *See Taylor,* 134 S.W.3d at 26. Finding no abuse of discretion, Defendant's second point is denied.

### Decision

The trial court's judgment of conviction is affirmed.

NANCY STEFFEN RAHMEYER and WILLIAM W. FRANCIS, JR., JJ., concur.