

# Missouri Court of Appeals
## Southern District

### In Division

STATE OF MISSOURI, )
)
    Plaintiff-Respondent, )
)
vs. ) No. SD38257
)
MICHAEL RAY DURISON, ) **Filed: October 4, 2024**
)
    Defendant-Appellant. )

APPEAL FROM THE CIRCUIT COURT OF MCDONALD COUNTY

The Honorable Kevin L. Selby, Judge

**<u>AFFIRMED</u>**

Michael Ray Durison ("Durison") was convicted, following a jury trial, in the Circuit Court of McDonald County, Missouri ("trial court"), of assault in the first degree against a special victim (Count I), armed criminal action (Count III), and disarming a correctional officer while performing official duty (Count IV). *See* sections 565.050, 571.015, and 575.153, respectively.[1] On appeal, Durison raises three points challenging his convictions under Counts I and III, but not his conviction under Count IV. Durison argues there was insufficient evidence to show (1) he attempted to cause serious physical

---

[1] References to sections 565.050 and 575.153 are to RSMo 2016, including all applicable changes effective January 1, 2017. References to section 571.015 are to RSMo Cum. Supp. 2020.

1

injury to a corrections officer ("Victim"), (2) he committed assault in the first degree so there was insufficient evidence to find he committed the "attached offense" of armed criminal action, and (3) the Taser[2] was a dangerous instrument readily capable of causing death or serious physical injury. Finding no merit to Durison's points on appeal, the trial court's judgment is affirmed.

**Factual Background and Procedural History**

While Durison was an inmate at the Newton County Jail, he was transported from the jail to the hospital to receive medical treatment. Durison was wearing a belly belt when he arrived at the hospital, which included handcuffs and leg shackles. Victim, a corrections officer, arrived at the hospital to relieve the officer on duty while Durison was still in the waiting room. During the hospital visit, medical personnel requested Durison's handcuffs be removed for better access to insert an IV. Victim removed Durison's handcuffs per that request. Durison's leg shackle on his right ankle remained attached to the hospital bed but his left ankle was free from restraint.

After several hours, the medical staff finished treating Durison and left the exam room. Victim loosened the shackle around Durison's right ankle to readjust the leg shackles and re-secure his hands with the handcuffs.[3] While Victim was adjusting the

---

[2] "A Taser is an electronic weapon designed to incapacitate a suspect once deployed. A Taser deploys two prongs, both of which are required to hit the targeted suspect in order to activate an electrical current." *State v. Henry*, SD 37196, 2024 WL 2149866, at *2 n.7 (Mo. App. S.D. May 14, 2024). "Taser is a trademark name 'used for a gun that fires electrified darts to stun and immobilize a person.' *Merriam-Webster's Collegiate Dictionary* 1279 (11th ed. 2005)." *State v. Ondo*, 231 S.W.3d 314, 315 n.3 (Mo. App. S.D. 2007).

[3] Victim admits that this was not the correct procedure for transferring an inmate, and he was given an official reprimand.

2

restraints, Durison jumped out of the bed and told Victim he was "not going back." Durison attempted to push past Victim and Victim began pushing back against him. During the struggle, Durison pushed Victim out of the exam room and into the emergency room hallway. Victim was able to push Durison against a door and put his arm across his chest. Victim attempted to talk Durison out of resisting, but Durison repeated he was "not going back."

Victim then drew his Taser and attempted to use it against Durison. Victim's Taser had two cartridges, each containing two probes, which were connected to the Taser that could be deployed to stick to the target individual's body to incapacitate him. Victim deployed the two cartridges during the struggle, but missed both times. One probe connected to Durison's shirt and the other probe landed on the floor.

The emergency room door then gave way and Durison took the Taser from Victim as they continued to struggle. At that point, the Taser only had the ability to drive stun.[4] Victim and Durison fell to the ground. Durison repeatedly attempted to drive stun Victim with the Taser, and succeeded in stunning him twice in the arm. As a result, Victim had the sensation of pins and needles in his arms, coupled with numbness that expanded into his shoulders. Victim was unable to use his arms during this time. After

---

[4] Victim testified that once the probes are deployed the only thing a Taser can do is "drive stun," which is "like using a regular stun gun" with the "arcs . . . at the end of the [T]aser." Sergeant Daniel Fox, a Taser instructor, testified that a "drive stun" is the second mode of the Taser, used after the probes have been fired, using electricity to burn the skin with a "push to activate" button. "'Drive stun' [i]s described as administering an electrical current by direct contact of the Taser to skin, as opposed to the prongs which can be deployed at a distance. Once the prongs are deployed, drive stun is the only method available to use a Taser." **Henry**, 2024 WL 2149866, *2 n.8.

Victim was drive stunned with the Taser, Durison was able to stand up and escape from the struggle, putting distance between himself and Victim. Durison then pointed the Taser at Victim and repeatedly pulled the trigger, but the cartridges were spent. Durison then ran out of the hospital.

Victim attempted to follow Durison, but fell back to the ground. Victim felt disoriented, with blurry vision and rapid shallow breaths, and was physically unable to chase Durison out of the hospital. Victim was able to stand after several minutes, but his issues with dizziness, breathing, and vision remained, leaving him still physically unable to follow Durison. The hospital staff conducted a medical examination on Victim, where they found burn marks on his arm from the Taser. Victim was not given any medications and was released from the hospital with instructions to follow-up with OccuMed the next day. After that follow up, he was cleared to return to work.

Durison was eventually found, arrested, and returned to the county jail. Durison was charged with one count of assault in the first degree against a special victim, one count of robbery in the first degree, one count of armed criminal action, one count of escape from custody, and one count of disarming a correctional officer.[5]

At trial, Sergeant Fox testified that a Taser is a device that "uses electricity to control muscle groups in a person . . . that incapacitates them to the point that they can be then restrained and controlled." Sergeant Fox testified that a Taser is considered a "less-than-lethal" weapon, meaning that although it is not designed to be a lethal device, a

_____

[5] The jury found Durison not guilty of the robbery charge and the trial court granted Durison's motion for judgment of acquittal at the close of the State's evidence related to the escape from custody charge. The jury also found Durison guilty of disarming a correctional officer, but he does not contest that conviction on appeal.

Taser is not one hundred percent non-lethal. Sergeant Fox described the two different ways to use a Taser: drive stun and firing probes. Drive stunning requires the operator to push a button with the muzzle of the Taser placed against the skin, and firing probes requires the operator to squeeze the trigger to deploy the probes from a safer distance. When asked if he instructs "on ways to prevent fatalities when using a [T]aser[,]" Sergeant Fox testified they train to use a Taser on an individual's extremities, arms or legs, but not to use a Taser on any part of the face, head, groin, or chest of an individual. Specifically, they do not target the heart as that could disrupt the rhythm of the heart. They also recommend during instruction that a Taser not be used for more than fifteen seconds, even though it sends an electrical current for five seconds and can be reactivated over and over again. Sergeant Fox further testified that law enforcement officers must be trained before they are issued a Taser, and Victim was instructed on the legal and safe uses of a Taser, including what parts of a person's body to target. The safety course taught the legal uses of a Taser, how to properly carry a Taser, how to fire a Taser, how to aim a Taser, and what parts of the body to target and not target. He further testified that although Tasers are not *designed* to be lethal, there was a possibility Tasers could be lethally dangerous.

Victim testified at trial that the drive stun function is used as a pain compliance tool. He further testified that drive stunning produces a similar effect to touching an electric fence, and his training indicated that using the drive stun function on forearms is safe. The hospital surveillance footage was also admitted into evidence as Exhibit 3, which depicts the altercation between Durison and Victim.

Durison filed motions for judgment of acquittal at the conclusion of the State's case and again at the conclusion of all the evidence arguing that the State failed to prove essential elements of the crime and failed to prove Durison acted with the requisite mental state; the evidence failed to establish the corpus delicti and failed to establish the requisite mental state for the alleged offense; the evidence was insufficient as a matter of law to support a finding of guilt or to support a conviction of any offense charged or lesser included offense; and the evidence did not establish guilt beyond a reasonable doubt. The trial court denied Durison's motions for judgment of acquittal on all counts except for the escape from custody charge.

The jury found Durison guilty of assault in the first degree against a special victim, armed criminal action, and disarming a correctional officer. The trial court found Durison to be a prior and persistent felony offender and sentenced him to ten years' imprisonment for assault in the first degree against a special victim, five years' imprisonment for armed criminal action, and five years' imprisonment for disarming a correctional officer. The trial court ordered all sentences to be served consecutively to each other, totaling twenty years' imprisonment. This timely appeal follows.

**Standard of Review**

This Court's review of the trial court's ruling on a motion for judgment of acquittal is to determine whether there is sufficient evidence for the trier of fact to have found the defendant guilty beyond a reasonable doubt. ***State v. Meador***, 660 S.W.3d 650, 652 (Mo. App. S.D. 2022). "Appellate review of sufficiency of the evidence is limited to whether the State has introduced adequate evidence from which a reasonable finder of fact could have found each element of the crime beyond a reasonable doubt." ***State v.***

6

*Lammers*, 479 S.W.3d 624, 632 (Mo. banc 2016). A trial court's judgment will be reversed only where there was insufficient evidence to find the defendant guilty beyond a reasonable doubt. *State v. Salsman*, 686 S.W.3d 376, 390 (Mo. App. S.D. 2024). This Court does not weigh the evidence anew, but only determines whether the judgment is supported by sufficient evidence. *State v. Loughridge*, 395 S.W.3d 605, 607 (Mo. App. S.D. 2013). "This Court does not act as a 'super juror'" and grants great deference to the trier of fact in reviewing the sufficiency of the evidence. *State v. Brown*, 661 S.W.3d 27, 35 (Mo. App. S.D. 2023) (quoting *State v. Naylor*, 510 S.W.3d 855, 859 (Mo. banc 2017)). All evidence and inferences are viewed in the light most favorable to the verdict, and all evidence and inferences contrary to the verdict are disregarded. *State v. Massa*, 410 S.W.3d 645, 659 (Mo. App. S.D. 2013). The credibility and weight of testimony are for the fact-finder to determine, and the fact-finder may believe all, some, or none of the testimony when arriving at its decision. *State v. Cannafax*, 344 S.W.3d 279, 284 (Mo. App. S.D. 2011).

**Analysis**

Point I

In his first point on appeal, Durison claims there was insufficient evidence to prove beyond a reasonable doubt that Durison attempted to cause serious physical injury to Victim by tasing him. We disagree.

A person commits the class A felony of assault in the first degree against a special victim if they "attempt[] to kill or knowingly cause[] *or attempt[] to cause serious physical injury to another person*," and said person is a "corrections officer of the state or one of its political subdivisions assaulted in the performance of his or her official duties

7

or as a direct result of such official duties[.]" Sections 565.050.1 and 565.002(14)(g) (emphasis added).[6] Serious physical injury is defined as a "physical injury that creates a substantial risk of death or that causes serious disfigurement or protracted loss or impairment of the function of any part of the body[.]" Section 556.061(44).[7] Protracted loss or impairment is defined as "something 'short of permanent but more than of short duration.'" *State v. Carpenter*, 592 S.W.3d 801, 805 (Mo. App. S.D. 2019) (quoting *State v. Lee*, 528 S.W.3d 59, 67 (Mo. App. S.D. 2017)).

To be convicted of assault in the first degree, the State had to prove that Durison (1) had the purpose to commit assault in the first degree, and (2) committed some act that was a substantial step toward completing assault in the first degree. *Lammers*, 479 S.W.3d at 632. Acting with purpose "is to have a conscious object to engage in certain conduct or to cause a certain result." *State v. McAllister*, 399 S.W.3d 518, 521 (Mo. App. E.D. 2013). "Substantial step" is defined as "conduct which is strongly corroborative of the firmness of the actor's purpose to complete the commission of the offense." Section 562.012.1.[8]

It is presumed that a person intends the natural and probable consequences of their actions. *State v. Fraga*, 189 S.W.3d 585, 590 (Mo. App. S.D. 2006). Because direct evidence of intent is rarely available, intent to cause physical injury is often proven by circumstantial evidence. *State v. Herrington*, 315 S.W.3d 424, 426 (Mo. App. S.D.

---

[6] All references to section 565.002 are to RSMo 2016, including all applicable changes effective January 1, 2017. There was no dispute at trial that Victim was a corrections officer.

[7] All references to section 556.061 are to RSMo Cum. Supp. 2020.

[8] All references to section 562.012 are to RSMo 2016, including all applicable changes effective January 1, 2017.

8

2010). "[T]he necessary intent may be based upon circumstantial evidence or inferred from surrounding facts such as evidence of defendant's conduct before the act, from the act itself, and from the defendant's subsequent conduct." *State v. Harris*, 684 S.W.3d 385, 389 (Mo. App. E.D. 2024) (quoting *Potter v. State*, 679 S.W.3d 50, 56 (Mo. App. E.D. 2023)).

At trial, the State produced evidence that Durison engaged in a physical altercation with Victim while Durison was being treated at the hospital. Victim testified he drew his Taser to subdue Durison by firing its two cartridges, which left the Taser with the capability to drive stun. The video recording of the assault showed Durison continuing to point the Taser at Victim and pulling the trigger, attempting to drive stun and fire probes at any part of Victim's body that he could hit. "Whether or not the object that is perceived as a deadly weapon or dangerous instrument is in fact capable of producing harm is unimportant." *State v. Simrin*, 384 S.W.3d 713, 719 (Mo. App. S.D. 2012) (quoting *State v. Archer*, 814 S.W.2d 315, 317 (Mo. App. S.D. 1991)). The object becomes a dangerous instrument when there is a threat to use the object to produce harm. *Id.* In this case, it was reasonable for the jury to infer that, although the two cartridges from the Taser were already spent, Durison was attempting to deploy probes at Victim by the manner in which he was using the Taser. An attempt to cause serious physical injury constitutes assault in the first degree. *State v. Bruce*, 677 S.W.3d 867, 874 (Mo. App. S.D. 2023) (citing section 565.050.1)). "A conviction for assault in the first degree requires evidence of a specific intent to cause serious physical injury." *Id.* It was also reasonable for the jury to find that Durison was attempting to cause serious physical injury in order to escape custody when he took the Taser from Victim during their

9

struggle and repeatedly attempted to drive stun Victim with the Taser, and succeeded in stunning him twice in the arm.

Durison also repeatedly said he was "not going back." From these statements, it was reasonable for the jury to infer that Durison continued his attempts to use the Taser against Victim for the purpose of causing Victim to suffer a protracted loss or impairment so that Durison could successfully escape custody. The evidence showed that because Durison repeatedly attempted to drive stun Victim, and succeeded in stunning him twice, Victim suffered loss of vision, rapid breathing, and physical disorientation, yet Durison continued his attempts to point the Taser at Victim and pull the trigger, even after he was physically separated from Victim. This is further evidence that he was attempting to cause serious physical injury to Victim.

Further, the testimony of Victim and Sergeant Fox could be used by the jury to conclude Durison attempted to cause serious physical injury. Sergeant Fox's expert testimony indicated officers must be trained on the legal and safe use of a Taser before one is issued to them. The purpose of the Taser training is "to prevent fatalities when using a [T]aser[,]" as Tasers cannot be considered a non-lethal weapon. During training, officers learn (1) it is unsafe to Taser an individual in certain areas of the body, including the head, chest, groin, or face; and (2) it is recommended that a Taser not be used for more than fifteen seconds. Victim testified to having dizziness, blurry vision, and rapid and shallow breathing after the initial drive stuns. Even after hitting Victim with the Taser twice, Durison persisted in his efforts to hit any part of Victim's body with the Taser.

10

It is not this Court's place to determine the reliability or credibility of witnesses, and we afford great deference to the jury in such matters. ***State v. Bolthouse***, 362 S.W.3d 457, 458 (Mo. App. S.D. 2012). In considering the testimony of Victim and Sergeant Fox alongside the surveillance video, it was reasonable for the jury to infer that Durison's continued efforts to use the Taser was for the purpose of causing Victim to suffer serious physical injury in order for Durison to escape custody by incapacitating Victim. Point I is denied.

## Point II

In his second point on appeal, Durison claims because there was insufficient evidence to find him guilty of the underlying felony of assault in the first degree, there was also insufficient evidence to find Durison guilty of the corresponding charge of armed criminal action.

"Any person who commits any felony under the laws of this state by, with, or through the use, assistance, or aid of a dangerous instrument or deadly weapon is also guilty of the offense of armed criminal action[.]" Section 571.015.1. "A conviction for armed criminal action requires the commission of an underlying felony." ***State v. Weems***, 840 S.W.2d 222, 228 (Mo. banc 1992). Here, Durison argues the conviction for armed criminal action must be reversed because there was insufficient evidence to prove the underlying felony of assault in the first degree. Because we determined there was sufficient evidence to find Durison guilty of assault in the first degree in Point I, there was also sufficient evidence to find Durison guilty of armed criminal action. Therefore, Point II is denied.

11

In his third point, Durison argues there was insufficient evidence to find him guilty of armed criminal action because the State failed to prove beyond a reasonable doubt that the Taser used was a dangerous instrument as it was not readily capable of causing death or serious physical injury. Again, we disagree.

Armed criminal action is described as "any felony under the laws of this state by, with, or through the use, assistance, or aid of a dangerous instrument or deadly weapon[.]" Section 571.015.1. A "[d]angerous instrument" is "any instrument, article or substance, which, under the circumstances in which it is used, is readily capable of causing death or other serious physical injury[.]" Section 556.061(20). As previously noted, "[s]erious physical injury" is a "physical injury that creates a substantial risk of death or that causes serious disfigurement or protracted loss or impairment of the function of any part of the body[.]" Section 556.061(44). In determining whether an instrument is a dangerous instrument as statutorily defined, we consider whether the instrument was readily capable of causing death or serious physical injury "under the circumstances in which it [was] used." Section 556.061(20); *see State v. Brittain*, 539 S.W.3d 925, 928-29 (Mo. App. S.D. 2018) (holding that a metal pipe was used in a manner readily capable of causing physical death or serious physical injury where the defendant "came after" the victim, overtly threatening to use the pipe to injure or even kill the victim). The defendant must know they are using the instrument under circumstances that are capable of causing serious injury or death, but "[t]he state is not required to prove that the defendant had the subjective intent to cause death or serious physical injury." *State v. Williams*, 126 S.W.3d 377, 383-84 (Mo. banc 2004).

Here, sufficient circumstantial evidence existed for the jury to infer that not only was the Taser capable of causing serious physical injury under the circumstances used, but that Durison knew the Taser was capable of causing such injury. At trial, Sergeant Fox testified to the safety of a Taser, classifying it as a "less-than-lethal" instrument because although they were not designed to be lethal, a Taser could potentially be a lethal instrument. Sergeant Fox further testified that in order to safely use a Taser, officers attend a safety course that instructs on proper use of a Taser. The jury could infer that Durison's untrained use of a Taser could lead it to be a dangerous instrument. *See Henry*, 2024 WL 2149866, at *2 n.7 (recognizing "expert testimony that a Taser can cause death or serious physical injury if used by someone not trained in its use"). It is well within the jury's prerogative to give Sergeant Fox's testimony weight and determine the Taser to be a dangerous instrument.

There is also sufficient evidence for a jury to believe Durison knew the Taser was capable of causing serious injury. As seen on the surveillance footage, Durison continued to use the Taser after distancing himself from Victim. From this, it is easily inferred that Durison was using the Taser to cause Victim serious injury and ensure Victim was unable to follow him out of the hospital. While the Taser was incapable of ejecting probes, and therefore was not capable of injuring Victim beyond the initial drive stuns, it does not matter that the attempted offense was factually impossible "if such offense could have been committed had the attendant circumstances been as the actor believed them to be." Section 562.012.2. When viewing the evidence in the light most favorable to the verdict, there is sufficient evidence for a jury to find Durison guilty of armed criminal action.

13

**Conclusion**

The evidence introduced at trial, when viewed in the light most favorable to the verdict, is sufficient to support the convictions of assault in the first degree and armed criminal action. Points I, II, and III are denied, and we affirm the trial court's judgment.

JENNIFER R. GROWCOCK, C.J. – OPINION AUTHOR

JEFFREY W. BATES, J. – CONCURS

MATTHEW P. HAMNER, J. – CONCURS