WILLIAM W. FRANCIS, JR., J.
Lisa D. Hooper ("Hooper") appeals her conviction, following a jury trial, of first-degree murder and armed criminal action. The trial court sentenced Hooper to life imprisonment without parole for the first-degree murder conviction, and seven years' imprisonment for the armed criminal action conviction, with the sentences to run concurrently. Hooper challenges her convictions in seven points on appeal. Finding no merit to any of Hooper's points, we affirm the judgment and sentences of the trial court.
Factual and Procedural History
We recite the facts of this matter in accord with the principle that we view the evidence (and the reasonable inferences therefrom) in the light most favorable to the verdict. State v. Lammers , 479 S.W.3d 624, 630 (Mo. banc 2016).
Victim and Hooper were dating, though their relationship was rocky. Around a month before the shooting at issue in this appeal, Hooper had "run off [Victim and] a couple of other people from her house[,] and ... she had taken her gun and shot at [Victim]'s tailgate as they were leaving."
Around noon on May 9, 2016, Victim was driving Hooper, Brandon Hamm ("Hamm"), and K.H., to a restaurant in a nearby town. En route, Victim and Hooper got into an argument. When the four arrived, Hamm and K.H. got out of the truck to go into the restaurant. Hooper remained in the truck, "throwing a fit." Victim got out, directed Hamm and K.H. to get back in the truck, and the four departed without eating. They drove to Hooper's house. Hamm and K.H. stayed there, while Hooper and Victim left in Victim's truck.
*127 K.H. went home. A short time later, Victim and Hooper returned and picked up Hamm.
Victim was driving, Hooper was in the front passenger seat, and Hamm was in the rear passenger seat. Hooper and Victim began arguing about Hooper sending naked pictures of herself to another man. Victim broke up with Hooper, and the conversation went silent. Victim pulled up to a stop sign, paused, and then proceeded. At that time, Hooper shot Victim in the head with her pistol.
Hamm heard a loud "boom," and saw an "orange flash" near the truck's rearview mirror, around eye level for Hamm. Hamm was "certain" he had seen and heard a gunshot. Realizing that Hooper had shot Victim, Hamm jumped out of the truck and ran to his mother's house, which was a short distance down the street. He told his parents that Hooper had shot Victim, and his mother called authorities.
Hooper called 911 on her cell phone. She exited the vehicle, pistol in hand, and paced in front of the truck. Hooper insisted at least six times that the shooting was "an accident." Hooper turned and saw Hamm's mother, who was standing outside her home down the street. While still on the phone with 911 dispatch, Hooper went back in the truck, wedged her gun between the console and the front passenger seat, and came back out again.
When authorities arrived, Hooper made numerous self-serving statements. She insisted that: she did not mean to shoot Victim; the gun fell out of her "pocket" "when it went and misfired"; the gun "evidently" fell out of her "pouch" without her realizing; she did not know it would "misfire"; she did not know the gun fell out when she was reaching for her cigarettes in the console; the gun was on her side; and she did not know the safety was off.
Jennifer Hedgepath ("Hedgepath"), the 911 dispatcher, took Hooper's call. Hedgepath had been a dispatcher for 12 years and had taken thousands of 911 calls. Hedgepath would later testify that when Hooper first called, "it was as calm as me sitting here talking to you now. It was like oh, nonchalant." Then as more people arrived, Hooper's "voice escalated into I need to be panicked or I should change for this. It wasn't a natural response as far as any other 911 call I've ever taken."
Officer Michael Sanders ("Officer Sanders") was the first officer to arrive. He observed Hooper standing outside the driver's side door of Victim's truck applying pressure to Victim's neck with a T-shirt (Hooper shot Victim in the head ). Officer Sanders later testified that Hooper was speaking "louder and louder. The more people got there the louder she got." From Hooper, he observed "no tears, no emotions whatsoever."
Officer Sanders found a "38 bodyguard" gun in the front of the truck, between the passenger seat and the center console. There were three rounds left in the six-round magazine, and there was one round in the chamber. The safety was off. No other firearms were found at the scene. Officer Sanders located a bullet wound to the back of Victim's head. The slug in Victim's head would later be determined to match the shell casing found in Victim's truck, as well as the bullets found in the magazine of Hooper's gun.
Sergeant David Maclin arrived at the scene, and performed an initial investigation. Hamm then approached him and said that Hooper shot Victim.
Victim was transported to the hospital by ambulance. His family made the decision to remove life-support shortly thereafter, and Victim died. Dr. Russell Deidiker, a pathologist, performed Victim's autopsy. He determined that Victim's death was *128 caused by a single gunshot wound to the head, and classified the death as a homicide. Dr. Deidiker found the entrance wound to be in the back of Victim's head just to the left of the mid-line, about the level of the ears. The path of the bullet was from Victim's back to front-from Victim's right to left, and slightly downward. The bullet path indicated that the fatal shot had not been fired from a position lower than the entry point.
Hooper was charged by amended information with the class A felony of first-degree murder (Count I), pursuant to section 565.020;[2] and armed criminal action (Count II), pursuant to section 571.015.[3]
While awaiting trial on those charges, Hooper was held at the Pemiscot County Jail. The jail had a policy to record all incoming and outgoing calls, and utilized a third-party contractor-IC Solutions-to implement and maintain the recording system. A voice at the beginning of these calls warned that the call was being recorded. If an attorney called the jail, or IC solutions, and provided phone numbers the attorney did not want recorded for purposes of attorney-client privilege, those phone numbers would then be entered into the system, and the calls to or from those phone numbers were not recorded.
There were three phone calls Hooper either made or received, wherein a voice stated "this is an attorney-client privilege call" at the beginning of the call. These calls were recorded, as no one had requested that such phone numbers be excluded from the recording system.
These recordings (along with the other recordings of Hooper's prison communications) subsequently came into the possession of both defense counsel and the prosecutor. An investigator at the prosecutor's office, upon noticing the initial recitation at the beginnings of the calls that they were attorney-client communications, stopped listening, and segregated those calls such that their substance would not be reviewed or revealed. Defense counsel sent the prosecutor a text message saying that the prosecutor's office had received some CDs containing conversations between Hooper and her attorney. The prosecutor promptly acknowledged defense counsel's message, and instructed staff to maintain the recordings, but not to review them until the prosecutor's office received instructions from the trial court on what was to be done with them.
On April 13, 2017, Hooper filed a "Motion to Dismiss for State's Violation of Defendant's 6th Amendment Rights and Defendant's Right to a Fair Trial" asserting that: (1) three confidential and privileged telephone conversations Hooper had with her attorney were recorded by the Pemiscot County Jail staff; (2) the conversations were confidential/privileged communications between Hooper and her attorney; (3) the recorded conversations contained Hooper's version of the events that transpired; and (4) a CD containing the recorded conversations was delivered to the prosecuting attorney's office. Hooper requested dismissal of all charges then pending against her.[4]
*129 A hearing was held April 21, 2017, on Hooper's motion to dismiss. The challenged recordings were not admitted into evidence, and not submitted for in camera review. Hooper's counsel made various unsworn arguments as to the contents of the recordings, but there was no evidence adduced thereto. The trial court overruled Hooper's motion to dismiss.
Trial commenced on April 27, 2017. Hooper did not testify. The jury found Hooper guilty of first-degree murder and armed criminal action.
Hooper filed a "Renewed Motion for Judgment of Acquittal Pursuant to Missouri Supreme Court Rule 27.07(C)," and a "Motion for New Trial." After hearing argument, the trial court took the motions under advisement. The trial court subsequently overruled both motions.
Thereafter, the trial court sentenced Hooper to life imprisonment without the eligibility for probation or parole for her conviction of first-degree murder, and a term of seven years' imprisonment for her conviction of armed criminal action, with the sentences to run concurrently. This appeal followed.
Hooper challenges her convictions in seven points relied on. Summarily, these points challenge the trial court's denial of her motion to dismiss the charges against her on the basis of her "Motion to Dismiss for State's Violation of Defendant's Sixth Amendment Rights and Defendant's Right to a Fair Trial" due to the prosecutor's possession of certain recordings of attorney-client communications; insufficient evidence to support her convictions; and various plain errors alleged to have been committed by the State.[5]
Analysis
Point I: Hooper's "Motion to Dismiss"
In her first point, Hooper alleges that the trial court erred in denying her "Motion to Dismiss for State's Violation of Defendant's Sixth Amendment Rights and Defendant's Right to a Fair Trial." Hooper argues that three recordings of phone conversations she had with pre-trial counsel came into the possession of the prosecutor's office before trial. As best as we can track Hooper's reasoning, we discern the thrust of her argument to be: (1) the content of the three calls were subject to attorney-client privilege; (2) the State's possession of the recordings was-by itself-sufficient to demonstrate prejudice; and (3) the appropriate remedy was dismissal of all charges then pending against Hooper, and the trial court erred in denying that relief.
As applicable here, we defer to the trial court's fact findings (explicit and implicit) relevant to its challenged ruling; our review is de novo as to the trial court's application of the law to those facts (i.e. , the existence or non-existence of attorney-client privilege). See State v. Taylor , 298 S.W.3d 482, 492 n.4 (Mo. banc 2009); see also Roesing v. Dir. of Revenue , --- S.W.3d ----, ----, 2018 WL 1276969, at *6 (Mo. App. W.D. Mar. 13, 2018).
*130 Hooper's argument on appeal is premised on a violation of, in Hooper's words, "[t]he Sixth Amendment to the United States Constitution [that] guarantees every defendant the right to effective assistance of counsel."
This Court has clearly set out that in order to preserve a constitutional issue for appeal a party must (1) raise the constitutional issue at the first available opportunity, (2) specifically designate the constitutional provision claimed to have been violated by express reference to the article and section of the constitution or by quoting the provision itself, (3) state the facts showing the violation ; and (4) preserve the constitutional question throughout for appellate review.
State v. Gannaway , 497 S.W.3d 819, 821-22 (Mo. App. S.D. 2016) (internal quotation and citation omitted) (emphasis added). The facts, for this purpose, refer to the credited evidence,[6] "as there presented," based "on the record made in the trial court" at the time of the constitutional challenge. State v. Davis , 348 S.W.3d 768, 770 (Mo. banc 2011) (internal quotation and citation omitted). The constitutional challenge is limited to the record's recitation of "those objections or grounds of objection" made at that time, and the credited evidence there presented. Id. Only these bases for the constitutional challenge, "without change and without addition, will be considered on appeal." Id. (internal quotation and citation omitted); see State v. Driskill , 459 S.W.3d 412, 425-26 (Mo. banc 2015). Where a constitutional challenge is not preserved, the appellant "is not entitled to review." Gannaway , 497 S.W.3d at 823.
Hooper was the party asserting attorney-client privilege, and had the burden to adduce credited evidence proving "the existence of the privilege." State ex rel. Koster v. Cain , 383 S.W.3d 105, 117 (Mo. App. W.D. 2012). "The subjective intent or wishes of the parties cannot create a privilege where none exists." Id. at 120 (internal quotation and citation omitted). Our courts have rejected claims of attorney-client privilege that were "generic," "non-specific," "hypothetical," "blanket assertions," or where such claims were limited to matters that were only "potentially privileged," or " 'may' require ... disclosure" of privileged communications. Id. at 117-18 (emphasis added). "[S]tatements and arguments of counsel are not evidence we may consider for purposes of evaluating whether a [party] has met his burden[.]" State v. Jones , 525 S.W.3d 132, 138 (Mo. App. S.D. 2017).
Generally, a party seeking to demonstrate the existence of attorney-client privilege must submit any "detailed information, in camera or otherwise, sufficient to permit the trial court ... [and the reviewing] court to meaningfully evaluate the claim of privilege, as [the courts are] required to do on a case-by-case basis." Koster , 383 S.W.3d at 118. For the attorney-client privilege to attach, the party seeking to invoke the privilege must adduce-and persuade the trial court to credit-sufficient evidence to sustain its burden of proof as to:
1) [i]nformation transmitted by voluntary act of disclosure; 2) between a client and his lawyer; 3) in confidence; and 4) by a means which, so far as a client is aware, discloses the information to no third parties other than those reasonably necessary for the transmission of the information or for the accomplishment of the purpose for which it is to be transmitted. All four of the above elements *131 must be present for the privilege to apply. In addition, surrounding circumstances should be considered as they indicate the existence, or nonexistence, of any one of the elements.
State v. Longo , 789 S.W.2d 812, 815 (Mo. App. E.D. 1990) (internal citations omitted).
Further, as this Court has previously explained, "[i]n all instances, [the party seeking to invoke attorney-client privilege] must show (1) the existence of an attorney-client relationship at the time of the interaction or communication , and (2) that such relationship existed with regard to the subject matter of the communication or incident. " State v. Smith , 979 S.W.2d 215, 220 (Mo. App. S.D. 1998) (emphasis added).
In other words, a party claiming the privilege has the burden to prove that the subject matter of the asserted privilege was within the scope of the attorney-client relationship-"non-legal" communications, even between a lawyer and a non-lawyer, are not protected by attorney-client privilege.[7] Smith , 979 S.W.2d at 220. Absent this evidence, "the trial court ha[s] no basis for deciding" that the attorney-client privilege should attach, and is obliged to reject the application of the privilege to the matters at issue. Id. Even where the appellant demonstrates trial court error as to its application of the attorney-client privilege, the appellant must also show prejudice therefrom before appellant becomes entitled to relief on appeal. Id.
At oral argument, this Court specifically asked Hooper's appellate counsel-who was also Hooper's defense counsel at trial-whether the trial court "ever heard the recordings." In response, appellant's counsel made the following representation to this Court: "Yes, your Honor. We made a copy for the judge to review in camera. And ... we assume that [the trial court] did review [it] in camera after the conclusion of the hearing on the motion." The record yields no support for counsel's representation.
Hooper's brief does not direct us to any portion of the record in which the recordings were adduced as evidence, whether by in camera submission or otherwise. Independently, we have reviewed the complete legal file and transcript in this matter, and consistent with the State's suggestions at trial and on appeal, we find the record reveals no indication that the recordings were ever adduced into the record. The record also reveals no evidence adduced as to the contents of the recordings, aside from testimony that the calls began with someone claiming to be an attorney and saying the call was privileged. There is no indication in the record that the trial court credited that latter testimony, and our standard of review directs that we presume the trial court did not credit it.
Ex gratia , we observe that the recordings are not just absent from the record, but that the record contains positive indicia that the recordings were not submitted to the trial court, in camera or otherwise. We observe the following colloquy at the hearing on Hooper's motion:
[DEFENSE COUNSEL]: Communication of [d]efense strategy to the Prosecution.
That occurred in this case as well, your Honor, because the conversation that [Hooper] and [pre-trial counsel] that has been recorded he basically says tell me what-
[PROSECUTOR]: Objection. I don't want to be hearing- *132 [DEFENSE COUNSEL]: I'm not going to tell you what he said.
[PROSECUTOR]: Judge, that would be tainting the case right here if he makes the argument of what his alleged private conversation is that I have not heard yet. If the Defendant speaks it we cannot undo that.
I would ask to be allowed to leave the Courtroom if he is going to make an Offer of Proof at this time.
[DEFENSE COUNSEL]: Judge, I'm not going to make an Offer of Proof at this time. I didn't get out of law school yesterday. I'm not going to announce what she said.
I am not talking about the substance of what she specifically said. I am not going to say what he said. She outlines her theory to the attorney period of what happened.
THE COURT: If that's all you are going to say about it-
[DEFENSE COUNSEL]: That's all I'm going to say.
THE COURT: Okay.
In argument on the motion, the prosecutor made the following observation, reflecting on the absence of the recordings or their contents in the record: "There is not a cure, Judge, because we don't know what those conversations were.... I don't know that. All I know is what [defense counsel] is arguing." For clarity, and in line with the prosecutor's argument below, we observe that "[s]tatements and arguments of counsel are not evidence[.]" Jones , 525 S.W.3d at 138. Neither the trial court below, nor this Court on review, are authorized to consider defense counsel's unsworn representations as to the contents of the recordings. See id.
At the conclusion of argument on the motion, the following additional colloquy occurred:
[PROSECUTOR]: Judge, I would ask you to quash or overrule I guess the Motion to Dismiss and let us proceed to trial next week.
THE COURT: [Defense counsel], anything else?
[DEFENSE COUNSEL]: No, your Honor.
THE COURT: Thank you very much.
When the motion and the memorandum was filed I read I believe most of the cases. What I am going to do now is to apply the testimony presented today to the case law and I will take this motion under advisement and will rule on it shortly.
In other words, when the evidence closed on the motion hearing, the trial court indicated that it was considering the briefs submitted by counsels, and the testimony presented at the hearing. Defense counsel did not attempt to submit the recordings when the trial court asked if defense counsel had anything else to offer, and the trial court did not indicate that the recordings had been previously submitted for in camera review.
In the trial court's "Order Overruling Defendant's Motion to Dismiss," the trial court specifically recited the matters that counsel had put before it:
The Court has fully considered the Motion to dismiss [sic] filed by defendant, testimony at the motion hearing, the memoranda and argument of counsel and relevant case law.
The Court now being fully advised in the premises orders as follows:
[ ] Defendant's Motion to Dismiss is overruled and denied.
(Emphasis in original). Again, the trial court makes no indication that the recordings were submitted for in camera review. Quite simply, Hooper points to no evidence in the record-offered, admitted, submitted *133 for in camera review, credited, uncredited, or otherwise-whereby the trial court, or this Court, could determine the contents of the recordings, such as to discern whether privilege attached thereto. See Koster , 383 S.W.3d at 118. On this basis alone, Hooper's Point I must fail.
Hooper argues that the State's mere possession of the challenged recordings compels reversal and dismissal of the charges against her. The sole Missouri case on which Hooper relies for this issue is State ex rel. Healea v. Tucker , No. ED105348, 2017 WL 2451869 (Mo. App. E.D. 2017). We note that the Supreme Court granted transfer in Healea on October 5, 2017,[8] and issued its Opinion on May 1, 2018. See State ex rel. Healea v. Tucker , 545 S.W.3d 348 (Mo. banc 2018). The Supreme Court recited that
the Columbia Police Department had surreptitiously recorded a conversation between Shayne Healea and his attorney at the police department[.] [A]ll parties agreed the recording infringed on Healea's attorney-client privilege and violated his Sixth Amendment rights. The infringement and violations are not at issue in this case.
Id. at 350 (emphasis added).
Here, there is no evidence that Hooper (or counsel in the recordings) were unaware that they were being recorded, or that the recordings were "surreptitiously" made. The jail phone system explicitly disclosed when calls were being recorded, and there was no evidence (credited or otherwise) that this disclosure did not take place before the challenged recordings were made.[9] To the contrary, at oral argument, Hooper's appellate counsel admitted that the disclosures took place, but suggested the disclosure was insufficient to alert Hooper that attorney-client privilege would be waived in such instance. For the reasons discussed supra , this argument is unavailing. Moreover, unlike Healea , Hooper failed to submit the recordings into the record, or adduce evidence as to the content of the recorded conversations, thus failing in her burden of proof as to attorney-client privilege.
Hooper fails to demonstrate that the trial court erred in denying her "Motion to Dismiss for State's Violation of Defendant's Sixth Amendment Rights and Defendant's Right to a Fair Trial." Point I is denied.
Points II and III: Sufficiency of the Evidence
Hooper's Points II and III challenge the sufficiency of the evidence to support Hooper's convictions of murder in the first degree and armed criminal action.[10]
*134 Appellate review of sufficiency of the evidence is limited to whether the State has introduced adequate evidence from which a reasonable finder of fact[11 ] could have found each element of the crime beyond a reasonable doubt. This Court considers all evidence in the light most favorable to the verdict and grants the State all reasonable inferences. Contrary evidence and inferences are disregarded. The Court will not supply missing evidence or grant the State unreasonable, speculative, or forced inferences.
Lammers , 479 S.W.3d at 632.
"The State may prove its case by presenting direct or circumstantial evidence. Upon appellate review, circumstantial evidence is given the same weight as direct evidence and the fact finder may make reasonable inferences from the evidence presented." State v. Cordell , 500 S.W.3d 343, 345 (Mo. App. S.D. 2016).[12] "All decisions as to what evidence the jury must believe and what inferences the jury must draw are left to the jury, not to judges deciding what reasonable jurors must and must not do." State v. Jackson , 433 S.W.3d 390, 399 (Mo. banc 2014). "[T]he jury may believe or disbelieve all, part, or none of the testimony of any witness." Id. at 403 (internal quotation and citation omitted). Therefore, it is incumbent upon an appellant to demonstrate that no combination of "all, part, or none" of the evidence, and "all, part, or none" of the available inferences therefrom, would have been sufficient to support the outcome. See State v. Finch , 398 S.W.3d 928, 929 (Mo. App. S.D. 2013) ; State v. Light , 407 S.W.3d 135, 137-38 n.4 (Mo. App. S.D. 2013) ; State v. Massa , 410 S.W.3d 645, 660 (Mo. App. S.D. 2013).
Hooper challenges her convictions of murder in the first degree, and armed criminal action. "A person commits the crime of murder in the first degree if he knowingly causes the death of another person after deliberation upon the matter." § 565.020.1. "The crime of first degree murder consists of three elements: (1) knowingly (2) causing the death of another person (3) after deliberation upon the matter." State v. Hudson , 154 S.W.3d 426, 429 (Mo. App. S.D. 2005) (internal quotation and citation omitted). "Deliberation" is defined as "cool reflection for any length of time no matter how brief[,]" section 565.002(5), and "may be proven from the circumstances surrounding the crime." Id. at 429 (internal quotation and citation omitted). "The actus reus is causing the death of a human being, and the mens rea *135 ... [is] doing so knowingly, and doing so deliberately."[13]
"[A]ny person who commits any felony under the laws of this state by, with, or through the use, assistance, or aid of a dangerous instrument or deadly weapon is also guilty of the crime of armed criminal action[.]" § 571.015. A "dangerous instrument" is "any instrument, article or substance, which, under the circumstances in which it is used, is readily capable of causing death or other serious physical injury[.]" § 556.061(9), RSMo Cum.Supp. (2013).
Hooper summarizes the nature of her evidentiary challenges as follows:
[Murder in the First Degree :] The State in this case failed to provide sufficient evidence to prove beyond a reasonable doubt that [Hooper] committed the very fundamental element of the offense of murder in the first degree, that she caused the death of [Victim]. Without proving that element of the offense, a jury does not confront the decision of whether a homicide was committed 'knowingly' and 'after deliberation upon the matter.'
[Armed Criminal Action :] Without proving that [Hooper] committed the underlying felony of murder in the first degree, which they wholly failed to do, it goes without saying that the state was unable to show that such was committed 'with, or through the use, assistance, or aid of a dangerous instrument or deadly weapon.' Therefore, there cannot possibly be a conviction for armed criminal action.
Thus, Hooper's entire evidentiary challenge is properly reduced to the actus reus of section 565.020.1-that Hooper "caus[ed] the death of another person." Hudson , 154 S.W.3d at 429 (internal quotation and citation omitted) (emphasis added). In other words, Hooper challenges the sufficiency of the evidence as to whether she was the cause of Victim's gunshot and that the gunshot was the cause of Victim's death. She does not challenge the sufficiency of the evidence as to whether her actions were: (1) knowingly-" 'aware of the nature of [her] conduct," ' or " 'aware that [her] conduct is practically certain to cause that result[ ]" ';[14] or (2) performed after deliberation. See § 565.020.1.
Hooper's argument runs afoul of the controlling principles of appellate review for a challenge to the sufficiency of the evidence. Her argument cites (and relies almost exclusively) on State v. Bunton , 453 S.W.2d 949 (Mo. banc 1970). Hooper recites that the Bunton court "reversed a defendant's conviction for arson when the evidence merely placed him near the scene at or near the time of the fire[,]" and the "prosecution failed to provide evidence of motive." We observe that Bunton applied the now-rejected "circumstantial evidence rule":
To make a circumstantial case against this appellant the State was obligated to prove a set of circumstances consistent with each other, consistent with a hypothesis that this appellant was guilty and at the same time inconsistent with a hypothesis that he is innocent and with every other rational hypothesis except that of guilt. The circumstances must be irreconcilable with the innocence of the accused.
Bunton , 453 S.W.2d at 952.
As we explained in State v. Plopper , 489 S.W.3d 848 (Mo. App. S.D. 2016) :
*136 Defendant's statements in his point that 'an inference cannot depend on another inference,' and his reference to inference-stacking hark back to the circumstantial evidence rule that 'originated as a higher standard to which circumstantial evidence cases were held.' State v. Grim, 854 S.W.2d 403, 405 (Mo. banc 1993).[15 ] Indeed, Defendant cites numerous cases that he believes are factually similar and support a finding in this case that there is insufficient evidence; however, almost all of those cases predate Grim. In Grim , our supreme court rejected the circumstantial evidence rule as a standard for reviewing the sufficiency of the evidence, recognizing that the 'circumstantial evidence rule provides no more guidance' than the standard of review for cases involving direct evidence, 'and a reviewing court, or a juror, must simply decide whether the theory presented is reasonable.' Id. at 406. The cases cited by Defendant relying on the circumstantial evidence rule, therefore, offer little, if any, analytical or persuasive value, and we will not address them.
Id. at 853 (internal footnote omitted).
As a result of this misapprehension, Hooper wholly fails to account for the reasonable inferences available from the evidence. Making an "inference" is "the act of passing from one or more propositions, statements, or judgments considered as true to another[,] the truth of which is believed to follow from that of the former[.]" WEBSTER'S THIRD INTERNATIONAL DICTIONARY , 1158 (1976). Put another way, "certain facts may be inferred ... from proof of other facts." Dunlop v. U.S. , 165 U.S. 486, 502, 17 S.Ct. 375, 381, 41 L.Ed 799 (1897) (emphasis added). "So, if a person be stabbed to death, and another, who was last seen in his company, were arrested near the spot with a bloody dagger in his possession," or "the shoes of an accused person were of peculiar size or shape, and footmarks were found in the mud or snow of corresponding size or shape," a reasonable inference of connection or causation-"more or less strong according to the circumstances[,]" may flow therefrom. Id. at 502-03, 17 S.Ct. 375, 381.
Our standard of review, and Hooper's task on appeal, account for such inferences:
[A]n insufficient-evidence claim involves the following sequential steps:
1. Identify a challenged factual proposition needed to sustain the conviction;
2. Identify all favorable evidence in the record tending to prove that proposition; and
3. Show why such evidence, when considered along with its reasonable inferences , is so non-probative that no reasonable fact-finder could believe the proposition.
Light , 407 S.W.3d at 137-38 n.4 (internal quotation and citation omitted) (emphasis added); accord Finch , 398 S.W.3d at 929 ; Massa , 410 S.W.3d at 660.
Hooper's argument ignores evidence and inferences favorable to the convictions (which we must credit), and relies on evidence and inferences in her favor (which *137 we must ignore). Light , 407 S.W.3d at 137-38. Her argument fails to complete an appellant's most fundamental task in a sufficiency-of-the-evidence challenge: to account for all of the favorable evidence in the record, and all the reasonable available inferences therefrom, that could support its challenged factual proposition, and then confront and dispel the probative value attending the same supportive evidence and inferences. Id. Hooper leaves this mandatory task undone, depriving her argument of any persuasive or analytical value. See Massa , 410 S.W.3d at 660-61.
The jury may draw inferences as to a defendant's intentions and motives "from the defendant's conduct before the act, during the act[,] and after the act." State v. Montiel , 509 S.W.3d 805, 809 (Mo. App. S.D. 2016) (internal quotation and citation omitted). Here, the inferences available from the evidence relevant to Hooper's mental state also lend significant support to the inference that Hooper was the cause of Victim's gunshot wound. The evidence at trial permitted the jury to find that Hooper had-before the shooting of which she was convicted-shot her gun at Victim when she was angry with him. Hooper described to a gun shop clerk that around a month before Victim was shot in the head, she had to "run off [Victim and] a couple of other people from her house, and ... she had taken her gun and shot at [Victim's] tailgate as they were leaving." See State v. Jacobs , 939 S.W.2d 7, 10 (Mo. App. W.D. 1997).
The evidence at trial permitted the jury to infer that Hooper was even angrier at Victim on the day Victim was shot, and that this was the motivating factor for the shooting.[16] The credited evidence at trial indicated that Hooper and Victim had been in a heated argument for the better part of the day, and Hooper had been so upset and "was throwing [such] a fit," that the party of four-Victim, Hooper, Hamm, and K.H.-had to abandon their plans to get food together. Immediately before the shooting, Victim broke up with Hooper because Hooper had been "sending naked pictures" to another man, and Victim told her he "didn't feel the same way about her any more [sic]." The conversation went silent. Victim pulled up to a stop sign, paused, and proceeded. Then Hamm heard a "boom" and saw an orange flash from a gun at his eye level (approximately the height of the rearview mirror).
The evidence of Hooper's conduct after the shooting also gives rise to the inference that she was the cause of Victim's gunshot wound. Hooper made numerous (and unprompted) false statements[17] to authorities aimed at defraying her culpability for Victim's gunshot wound. See State v. Chong-Aguirre , 413 S.W.3d 378, 387 (Mo. App. S.D. 2013) ("Consciousness *138 of guilt can be inferred from false statements made in an attempt to deceive the police."). The 911 operator testified at trial. She indicated that she had taken "[p]robably thousands[ ]" of calls, and "that one was different than any other I've ever taken." The 911 operator indicated that "[w]hen [Hooper] first called it was as calm as me sitting here talking to you now. It was like oh, nonchalant. And then as more people get there it is like her voice escalated into I need to be panicked or I should change for this. It wasn't a natural response as far any other 911 call I've ever taken." Officer Sanders, a responding officer, also testified at trial. He indicated that Hooper did not cry at the scene: "There was no emotions, no tears, no puffy eyes, no anything."
Hooper called 911 on her cell phone, and in response to questions such as "Where at?" and "Okay, what's your name?" stated, "16th and 7th, I think, my firearm accidentally went off ," and " Lisa Hooper. My, it accidentally went off. " While she was on the phone with 911 dispatch, Hooper was observed pacing in front of the truck with the gun in her hand. The jury could infer from this that Hooper had the gun in her hand when Victim was shot, and maintained possession of it thereafter. When Hooper realized she was being observed, Hooper immediately stowed the gun away "between the passenger seat and [the] console[.]" From this, the jury could infer that Hooper was trying to hide the gun, or hide the fact that she had been holding the gun during and after the shooting.
Police found Hooper's gun where she had left it-wedged between the passenger seat and the console, loaded, with the safety off, and its barrel facing the front windshield. Police also found a .380 bullet casing under the backseat of the truck, which matched Hooper's gun, and the slug found in Victim's head. The gun's magazine could hold six bullets, but only had four in it at the time police found it. The absence of two bullets from the magazine was consistent with the other evidence at trial, and warranted the inference that Hooper had fired one round at Victim's vehicle about a month prior, and another round into Victim's head at the time of the crimes charged.
Hooper also makes the argument that Victim's family was the cause of Victim's death, because they made the decision to remove Victim from life support after the shooting. Dr. Deidiker testified that Victim died because of "the actions of another person," which is what he wrote in the autopsy report. He testified that the removal of life support did not change that opinion, because "[t]he proximate cause of death was the gunshot wound to the head. If not for the gunshot wound to the head[,] [Victim] would never have been in the position of not being able to breathe on his own." This was sufficient evidence for the jury to infer that the Victim's gunshot wound was the cause of his death.
This Court's recent opinion in State v. Halverson , 541 S.W.3d 1 (Mo. App. S.D. 2018), is analogous and controlling:
Here, a reasonable fact-finder could find beyond a reasonable doubt from the evidence adduced that Defendant did not accidentally shoot Victim but, instead, knowingly shot him in the head with a 9 mm handgun with the purpose of causing his death. Such evidence included, among other things, that Defendant was experienced in shooting firearms, she was upset with Victim over his failing to provide her with a form that she wanted, her response to Victim's request that she call 9-1-1 of telling Victim that her phone was not working, her written plea for forgiveness, her statement that the shooting 'was not on purpose[,]' and her *139 inconsistent stories about what happened. Cf. [ State v. Harrell , 367 S.W.3d 122, 127 (Mo. App. S.D. 2012) ] (in the context of a changing story to explain incriminating facts, 'inconsistent statements can demonstrate consciousness of guilt.').
Id. at 6-7.
Hooper fails to show that there was a lack of sufficient evidence to support her convictions for first-degree murder and armed criminal action. Points II and III are denied.
Points IV, V, VI and VII
Hooper's Points IV, V, VI, and VII challenge that the State "committed" or "created" "reversible plain error" because the State : (1) presented cross-examination "beyond the scope of evidence" by "demonstrating a driving position of [Victim]" and "demonstrating a head position of [Victim]"; and (2) stating in closing argument that defense counsel "blatantly lied" and that the jury should find one of the State's witnesses credible. We have no authority to grant relief based on errors alleged to have been committed by the State.[18]
The judgment of the trial court is affirmed.
NANCY STEFFEN RAHMEYER, C.J./P.J.-Concurs
DANIEL E. SCOTT, J.-Concurs

All references to statutes are to RSMo 2000, unless otherwise indicated. All rule references are to Missouri Court Rules (2018).

The record recites that the facts comprising the crimes of which Hooper was convicted occurred on May 9, 2016. Section 565.020 was amended on July 13, 2016, effective August 28, 2016. We therefore use the 1990 version of the statute, which was in effect at the time of the alleged offense.

The State filed a response to the motion to dismiss on April 17, 2017, but it was not made part of the legal file.

We do not, by recitation, endorse Hooper's suggestion that we may review the prosecutor's conduct for plain error-reversible error derives from an action or inaction of the trial court (if at all). See Rule 84.04(d) (mandating that an appellant's point relied on "be in substantially the following form: 'The trial court erred in [identify the challenged ruling or action ], because [state the legal reasons for the claim of reversible error ], in that [explain why the legal reasons, in the context of the case, support the claim of reversible error ].' "). (bold emphasis added); Rule 84.04(e) ("The argument shall be limited to those errors included in the 'Points Relied On.' "). See also , Anglin Family Investments v. Hobbs , 375 S.W.3d 244, 250 (Mo. App. S.D. 2012).

Taylor , 298 S.W.3d at 492 n.4.

For a thorough discussion of this issue, see Koster , 383 S.W.3d at 117-21.

Hooper filed her brief on November 13, 2017, one month after the Supreme Court granted transfer in Healea .

The party asserting privilege has the burden of proof as to that issue. Koster , 383 S.W.3d at 117.

Point II challenges the sufficiency of the evidence "at the close of the State's evidence[,]" whereas Point III challenges the sufficiency of the evidence "at the close of all evidence[.]" The argument sections of Points II and III are substantively identical, and both relate to Hooper's suggestion that "the trial court ... erred in overruling [Hooper]'s motion for a judgment of acquittal based upon insufficient evidence at the close of the State's evidence [.]" (Emphasis added). Where an appellant "present[s] evidence in his own defense after the State rest[s], ... [the appellant] waive[s] this claim[,]" and the only claim remaining is the sufficiency of the evidence "at the close of all evidence." State v. Smith , 944 S.W.2d 901, 916 (Mo. banc 1997) ; see State v. Bumbery , 492 S.W.3d 656, 661 (Mo. App. S.D. 2016). We combine and curatively interpret Hooper's Points II and III, and their respective arguments, as challenges to the sufficiency of the evidence at the close of all evidence.

Appellate review of sufficiency of the evidence is not a test of "what a 'reasonable juror' in a criminal case must or must not find." State v. Jackson , 433 S.W.3d 390, 400 (Mo. banc 2014). "The question of whether the evidence is sufficient (i.e., whether a jury may find guilt beyond a reasonable doubt) is a proper question for trial and appellate courts, but the question of what the jury must find has no place in a criminal trial or appeal." Id. (emphasis in original).

As the United State Supreme Court has indicated:
Circumstantial evidence ... is intrinsically no different from testimonial evidence. Admittedly, circumstantial evidence may in some cases point to a wholly incorrect result. Yet this is equally true of testimonial evidence. In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference. In both, the jury must use its experience with people and events in weighing the probabilities. If the jury is convinced beyond a reasonable doubt, we can require no more.
Holland v. U.S. , 348 U.S. 121, 139-40, 75 S.Ct. 127, 137-38, 99 L.Ed. 150 (1954).

Wolff, Kister, & Sindel, 27 MISSOURI PRACTICE: CRIMINAL PRACTICE FORMS, § 7.49 (2d ed.).

State v. Thomas , 161 S.W.3d 377, 380 (Mo. banc 2005) (quoting section 562.016.3).

As our Supreme Court explained in Grim :
No reason remains to perpetuate this different rule. Any societal distrust of circumstantial evidence has long been abandoned. We no longer need to hold circumstantial evidence cases to a higher standard than direct evidence cases. If a jury is convinced beyond a reasonable doubt, so long as the evidence meets the minimal appellate standard required by due process, we need not disturb the result simply because the case depended wholly, mostly, or partially upon circumstantial proof.
854 S.W.2d at 406.

To be clear, motive is not an element that the State was required to prove pursuant to section 565.020.

The jury was free to believe Hooper's "explanation, but it did not have to do so." State v. Perry , 275 S.W.3d 237, 249 (Mo. banc 2009). Here, the jury disbelieved Hooper's explanation that the shooting was an "accident" or a "misfire," and instead believed other evidence presented at trial that the shooting was knowingly and made after deliberation. Dr. Deidiker testified that the shooting was not accidental based on the location of Victim's wound-Hooper's gun was not fired from a position lower than the entry point (Victim's head). Further, as Sgt. Maclin testified, "a gun that accidentally went off [would not hit Victim] in the back of his head, it would be lower torso somewhere." A firearms expert testified that he was unaware of "any accidental discharges" associated with the kind of gun Hooper had, and that the design of Hooper's gun made it extremely unlikely that it would fire just by being dropped-rather, the gun would need the trigger pulled to fire.

See n.5 of this opinion, supra.