

# Missouri Court of Appeals
## Southern District

### In Division

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| | ) | |
| Plaintiff-Respondent, | ) | |
| | ) | |
| vs. | ) | No. SD37867 |
| | ) | |
| BRANT M. WINKLE, | ) | **Filed: August 27, 2024** |
| | ) | |
| Defendant-Appellant. | ) | |

APPEAL FROM THE CIRCUIT COURT OF PEMISCOT COUNTY

The Honorable Fred W. Copeland, Senior Judge

**<u>AFFIRMED</u>**

Brant M. Winkle ("Winkle") appeals the judgment of the Circuit Court of Pemiscot County ("trial court") convicting him of one count of murder in the first degree (Count I) and one count of armed criminal action (Count II) following a jury trial. Winkle claims three points of trial court error on appeal. Each of Winkle's points relied on fail to comply with the mandatory provisions of Rule 84.04(d).[1] While the deficiencies of Points I and III require this Court to dismiss these points without review, Point II raises a sufficiency of the evidence claim which this Court is required to review regardless of its deficiencies. We, therefore, review Point II on its merits, dismiss Points I and III, and affirm the trial court's judgment.

---

[1] All rule references are to Missouri Court Rules (2024).

**Factual Background and Procedural History**

Winkle was charged with murder in the first degree and armed criminal action by Information filed December 7, 2020. A jury trial was held October 25 through October 28, 2022. Viewed in the light most favorable to the verdict, the following evidence was presented at Winkle's trial:

In the early morning hours of October 7, 2020, Winkle went to the residence of Cindy and David Chilton[2] and asked the couple to go somewhere with him. Winkle had come by their residence several times that week telling Cindy "crazy stories" about her and David's neighbor, D.H. ("Victim").[3] Winkle appeared to be on methamphetamine and told them that he had used methamphetamine that day. David had to work that morning so he did not go, but Cindy went.

As Winkle and Cindy were leaving the Chilton residence, Cindy noticed her baseball bat in Winkle's vehicle. Cindy told Winkle that he better not be wanting to "start no trouble." Winkle replied that they both might "end up in trouble before the night is over." Winkle then drove to Victim's house. At Victim's house, Winkle got "a long gun" from behind his seat and went to the front door. The front door opened, Cindy saw Winkle raise the gun and shoot, and Cindy heard the shot "knock[] the breath out of" Victim. Cindy tried to call 911 as Winkle fired a second shot. Cindy began screaming and Winkle returned to his vehicle. Cindy hid her phone. Winkle told Cindy to be quiet because she was going to get Winkle in trouble. Cindy told Winkle he needed to get Victim help. Neither Winkle nor Cindy called for help.

---

[2] David Chilton and Cindy Chilton will be referenced collectively as the "Chiltons" and individually as "David" and "Cindy."

[3] Cindy testified that, for example, Winkle stated Victim had "zapped his soul" and that the Chiltons were "supreme beings" who were about "to start a new universe."

Winkle then drove back to the Chilton residence. A mask and pair of gloves were on Winkle's dash; Winkle realized he had forgotten to wear them while at Victim's house. Winkle put the mask and gloves on and stated that he was going to go back and shoot Victim in the head. Winkle started to reload the gun and a "struggle" over the gun ensued between Cindy and Winkle. Winkle eventually released the gun and agreed to put it away. Winkle put the gun in a guitar case in his vehicle.

Winkle and Cindy then got into Cindy's truck. Cindy began to drive to her daughter's house to get Winkle away from the gun and Victim. When Winkle realized Cindy was not driving him in the direction of Victim's house, Winkle began yelling and hitting the dash of the truck. Cindy stopped the truck and Winkle jumped out. Cindy drove to the Steele Police Department in Pemiscot County, Missouri, and told Officer Larry Jared what she had witnessed.

Officer Jared called Cindy's cell phone that she had left in Winkle's vehicle. Someone answered her phone and Officer Jared heard a male voice making an "uh uh uh uh" noise and then the line went dead. Officer Jared contacted Dunklin County dispatch to inform it that he had received a report of a homicide in Dunklin County and requested a ping of Cindy's cell phone to determine its location. Dunklin County dispatch then contacted Dunklin County Sheriff Bob Holder.

While Cindy was at the police department, Winkle returned to the Chilton residence and asked David to hide a shotgun for him. David declined to do so and Winkle left the Chilton residence. Thereafter, a police officer stopped by the Chilton residence and informed David that they were investigating a homicide and looking for Winkle. After the officer left, Winkle returned to the Chilton residence again and told David "there's a lot of action at [Victim's]

3

house." David asked Winkle where Cindy was; Winkle said she had to leave. David called 911 and told them Winkle was at his residence.

Taylor Tinsley was the sheriff deputy on duty in Dunklin County when the homicide call came in. Deputy Tinsley met Dunklin County Deputy Nick Cobb, "other deputies [he] was working with," a police officer from Senath, Missouri, and a police officer from Hornersville, Missouri, at the Arbyrd Police Department. The officers and deputies then traveled to Victim's residence. When the officer's arrived at Victim's residence, Deputy Tinsley observed blood drops on the front step. Deputy Tinsley attempted entry into the residence, but the front door was blocked by Victim's body lying on the entrance floor. Deputy Tinsley was able to squeeze the door open. He saw Victim's body on the floor with a gunshot wound to his head.[4] Deputy Tinsley and another officer secured the scene with tape. Then, investigators with the Dunklin County Sheriff's Department and the Division of Drug and Crime Control ("DDCC") of the Missouri State Highway Patrol ("MSHP") responded to the scene.

Deputy Tinsley contacted Deputy Andrew Conley, who was assigned to the Major Case Squad for the Dunklin County Sheriff's Department. Deputy Conley went to the Steele Police Department and transported Cindy to the Dunklin County Justice Center in Kennett, Missouri. Deputy Conley also requested dispatch to ping Winkle's cell phone to determine his location. The GPS location obtained by the Dunklin County dispatch center directed the officers to a

---

[4] An autopsy revealed Victim sustained three shotgun wounds – in the abdomen, right side of the chest, and right side of the head. There were multiple pellets from a shotgun in the chest, abdomen, and "cranial vault." Part of Victim's skull and brain were missing. The forensic pathologist determined Victim's manner of death to be a homicide and cause of death from shotgun wounds of the head, chest, and abdomen.

cotton field "across the way from where the homicide happened and also just kinda behind the Chilton residence."

When they arrived at the Chilton residence, Deputy Tinsley, Deputy Conley, Sheriff Holder, and Master Sergeant Scott Stoelting, a supervisor of criminal investigations with MSHP, proceeded into the field behind the residence.[5] Deputy Conley observed "tracks" in the dew leading to the field. Deputy Conley called out to Winkle and Winkle responded with unintelligible noises. Based on Winkle's noises, they were able to locate Winkle lying on the ground in a cotton field. Winkle stated that he had "messed up" and that he was being "set up." Two cell phones, four spent shotgun shells or hulls, four live shotgun shells, two pocket knives, a flashlight, a set of keys, an Army ID and a Bible were found under Winkle's person.

Deputy Conley arrested Winkle on scene. Winkle stated that he placed the shotgun in the fence row between the cotton field and a neighboring soybean field. Winkle walked Deputy Conley to the location of the shotgun, a 12-gauge Remington 870 express magnum. Deputy Conley testified at trial that Cindy's account of the events during the early morning hours of October 7, 2020, was corroborated by the evidence found at the scene.

Deputy Conley then drove Winkle to the sheriff's department. During the drive, Winkle stated that a "tall man" had handed Winkle a shotgun and Winkle confessed that he shot Victim. Winkle stated that "it was a hell of a thing" and that Deputy Conley "wouldn't believe it." Winkle blamed his actions on a "higher power." Winkle then stated that Deputy Conley thought he was crazy and mentioned Russian involvement along with a known murderer in the area. He then stated that someone told him that he had killed Victim and that did not "even know if the

_____

[5] Law enforcement initially tried to track Winkle with a canine from the Greene County Sheriff's Department. The canine was unsuccessful in locating Winkle.

son of a bitch [was] dead or not." Winkle did not appear sober to Deputy Conley during the drive. Winkle was drug tested as part of the booking process into jail and tested positive for amphetamine, methamphetamine, ecstasy, and marijuana.

While Deputy Conley was transporting Winkle to jail, Corporal Wilson, a DDCC criminal investigator with the MSHP, investigated the scene. Corporal Wilson is an expert in blood spatter and shooting reconstruction. Corporal Wilson concluded that, based on the pattern of blood spatter and stain, the gunshots came from the doorway and that Victim was lying down when he was shot in the head. Corporal Wilson testified at trial that there were no spent shotgun shells at the scene and that the Samsung cell phone[6] and the spent shotgun hulls found with Winkle tied Winkle to the crime scene.

Darian Stinson is the criminal supervisor of the firearms section at the MSHP crime lab. Ms. Stinson tested the expended shotgun shells found near Winkle's person in the cotton field. Ms. Stinson opined at trial that the spent shotgun shells were fired from the Remington shotgun found in the field. Deputy Conley also testified that Ms. Stinson's conclusion that the shotgun hulls found in Winkle's possession "matched" the shotgun supported a finding that Winkle fired the shotgun.

A jury found Winkle guilty of the offenses as charged. Winkle was sentenced to a term of life imprisonment without the possibility of probation or parole for the offense of murder in the first degree and a consecutive term of three years' imprisonment for the offense of armed criminal action. Winkle timely appeals.

---

[6] Corporal Wilson stated that "[he] said the Samsung cell phone because [he] didn't know if there was text messages with [Winkle] on that cell phone, which would have been evidence that put him there. That's why [he] brought up the cell phone, which would also be evidence when [they] forensically download the cell phone" and "that [was] very common with the murders" he had worked.

6

## Discussion

### *Points on Appeal*

Winkle presents three points on appeal, all of which fail to comply with Rule 84.04.

Winkle's points on appeal stated in their entirety are:

> I. That the trial court plainly erred in denying the Defendant's Motion to Suppress and that error resulted in manifest injustice and miscarriage of justice.
>
> II. The Trial Court erred in overruling Defendant's motion for judgment of acquittal at the close of all evidence.
>
> III. The Trial Court erred in overruling Defendant's objection to the admission of Defendant['s[7]] drug test report.

### Rule 84.04(d)

Rule 84.04 sets forth the briefing requirements for an appellate brief. Rule 84.04(d) provides, in pertinent part, the briefing requirements of a point on appeal. A point on appeal must identify the challenged ruling or action by the trial court, state the legal reason why the challenged ruling or action constitutes reversible error, and explain wherein the context of the case these reasons constitute reversible error. Rule 84.04(d)(1). Specifically, Rule 84.04(d) states:

> **(d) Points Relied On.**
>
> (1) Where the appellate court reviews the decision of a trial court, each point shall:
>
> (A) Identify the trial court ruling or action that the appellant challenges;
>
> (B) State concisely the legal reasons for the appellant's claim of reversible error; and
>
> (C) Explain in summary fashion why, in the context of the case, those legal reasons support the claim of reversible error.

---

[7] Winkle's Point III reads "The Trial Court erred in overruling Defendant's objection to the admission of Defendant 'drug test report." This Court treats this as a typographical error on Winkle's part.

Rule 84.04(d)(1). The Rule explicitly provides a word-for-word template for an appellant's point on appeal.

> The point shall be in substantially the following form: "The trial court erred in [*identify the challenged ruling or action*], because [*state the legal reasons for the claim of reversible error*], in that [*explain why the legal reasons, in the context of the case, support the claim of reversible error*]."

Rule 84.04(d)(1).

"Because a template is specifically provided in Rule 84.04(d), there is no excuse for failing to submit an adequate point relied on." **State v. Haneline**, 680 S.W.3d 550, 562 (Mo. App. S.D. 2023).

> "Rule 84.04's requirements are mandatory." *Lexow v. Boeing Co.*, 643 S.W.3d 501, 505 (Mo. banc 2022) (quoting *Fowler v Mo. Sheriffs' Ret. Sys.*, 623 S.W.3d 578, 583 (Mo. banc 2021)). Although we prefer to decide cases on the merits, excusing technical deficiencies, it is improper to consider a brief "so deficient that it fails to give notice to this Court and to the other parties as to the issue presented on appeal." *Id.* (quoting *J.A.D. v. F.J.D.*, 978 S.W.2d 336, 338 (Mo. banc 1998)). "A point relied on that does not state 'wherein and why' the trial court . . . erred does not comply with Rule 84.04(d) and preserves nothing for appellate review." *Id.* (quoting *Storey v. State*, 175 S.W.3d 116, 126 (Mo. banc 2005)).

*Id.* at 561-62.

Analysis

Winkle's points on appeal fail to comply with Rule 84.04(d). Although this Court prefers to decide cases on the merits, Winkle's points on appeal are so deficient they fail to provide notice to this Court, or Respondent, as to the issues presented on appeal. Winkle's points relied on state what ruling or action is being challenged but fail to state the legal reason the challenged ruling or action is erroneous or explain why these legal reasons support a claim of reversible error in the context of the case. These requirements are often referred to as the "wherein" and "why" requirements of a point relied on. **Johnson v. Mo. Dept. of Corrections**, 534 S.W.3d 869, 872 (Mo. App. W.D. 2017). In order to address the merits of Winkle's points on appeal, this

8

Court would be required to search the record to determine wherein and why the challenged ruling or action is legally erroneous in the context of this case.

> "Deficient points relied on force the appellate court to search the argument portion of the brief or the record itself to determine and clarify the appellant's assertions, thereby wasting judicial resources, and, worse yet, creating the danger that the appellate court will interpret the appellant's contention differently than the appellant intended or his opponent understood."

*Guglielmino v. Jackson County*, 609 S.W.3d 852, 856 (Mo. App. W.D. 2020) (quoting *Holding v. Kansas City Area Transp. Auth.*, 584 S.W.3d 358, 361 (Mo. App. W.D. 2019)). This requirement would also place this Court in the role of appellant's advocate. *Id.* at 856-57; *see also* *Hardin v. State*, 51 S.W.3d 129, 131 (Mo. App. W.D. 2001) (finding deficient points on appeal that require the appellate court to search the record to determine the "wherein" and "why" of a point on appeal would require the appellate court to become an advocate for the appellant); *Franklin v. Ventura*, 32 S.W.3d 801, 803-804 (Mo. App. W.D. 2000) (holding appellant's failure to comply with Rule 84.04(d) would require the appellate court to become an advocate for appellant in order to discern what in the record substantiates the point on appeal). This Court cannot do so.

Points I and III are dismissed. For reasons stated hereinafter, even though Point II is also deficient, this Court is required to address the merits of Winkle's deficient Point II.

### Point II

In Point II, Winkle claims the trial court erred in overruling his motion for judgment of acquittal at the close of all the evidence. Winkle's motion for judgment of acquittal alleged the evidence was "insufficient to sustain a conviction for the offense of murder in the first degree and armed criminal action as charged in the information." This Court is required to review claims of insufficient evidence to support a conviction regardless of preservation or briefing

9

deficiencies. ***State v. Gomez***, 672 S.W.3d 113, 116 (Mo. App. S.D. 2023). "[S]ufficiency claims are considered on appeal even if not briefed or not properly briefed in the appellate courts." ***State v. Claycomb***, 470 S.W.3d 358, 361 (Mo. banc 2015).

Standard of Review

This Court's review of the trial court's ruling on a motion for judgment of acquittal is to determine whether there is sufficient evidence for the trier of fact to have found the defendant guilty beyond a reasonable doubt. ***Gomez***, 672 S.W.3d at 119. "Appellate review of sufficiency of the evidence is limited to whether the State has introduced adequate evidence from which a reasonable finer of fact could have found each element of the crime beyond a reasonable doubt." ***Id.*** (quoting ***State v. Lammers***, 479 S.W.3d 624, 632 (Mo. banc 2016)).

> In determining whether there is sufficient evidence "to support a conviction and to withstand a motion for judgment of acquittal, this Court does not weigh the evidence but rather accepts as true all evidence tending to prove guilt together with all reasonable inferences that support the verdict, and ignores all contrary evidences and inferences." *State v. Gilmore*, 537 S.W.3d 342, 344 (Mo. banc 2018) (alterations omitted), *quoting State v. Ess*, 453 S.W.3d 196, 206 (Mo. banc 2015).[]
> Circumstantial rather than direct evidence of a fact is sufficient to support a verdict. *State v. Grim*, 854 S.W.2d 403, 406 (Mo. banc 1993). If that evidence supports equally valid inferences, it is up to the factfinder to determine which inference to believe, as "[t]he [factfinder] is permitted to draw such reasonable inferences from the evidence as the evidence will permit." *State v. Hineman*, 14 S.W.3d 924, 927 (Mo. banc 1999). Reliance on circumstantial evidence, however, does not permit this Court to "supply missing evidence or give the state the benefit of unreasonable, speculative or forced inferences." *State v. Langdon*, 110 S.W.3d 807, 811-12 (Mo. banc 2003). "This Court asks only whether there was sufficient evidence from which the trier of fact *reasonably* could have found the defendant guilty." *State v. Claycomb*, 470 S.W.3d 358, 362 (Mo. banc 2015) (internal quotation omitted) (emphasis added).

***State v. Lehman***, 617 S.W.3d 843, 846-47 (Mo. banc 2021) (footnote omitted).

Analysis

The State alleged in its Information that Winkle committed murder in the first degree when he, "after deliberation, knowingly caused the death of [Victim] by shooting him" (Count I)

10

and that Winkle committed the offense of armed criminal action when he "committed the foregoing felony of murder in the first degree by, with and through, the knowing use, assistance and aid of a deadly weapon" (Count II). To prove the offense of murder in the first degree, the State must present evidence that Winkle (1) knowingly (2) caused the death of Victim by shooting him (3) after deliberation on the matter. *Gomez*, 672 S.W.3d at 119. To prove the offense of armed criminal action, the State must present evidence that Winkle (1) committed felony murder in the first degree (2) by, with, or through the use, assistance, or aid of a deadly weapon. Section 571.015, RSMo Cum. Supp. 2020; *State v. Blackman*, 968 S.W.2d 138, 140 (Mo. banc 1998).

Winkle does not challenge the sufficiency of the evidence as to the elements of "knowingly" and "after deliberation on the matter" required to prove the offense of murder in the first degree. In his motion for judgment of acquittal and in the argument portion of his brief, Winkle challenges the sufficiency of the evidence to prove that he caused Victim's death – the second element of the murder in the first degree charge. He asserts, "[t]he State specifically failed to show adequate evidence from which a reasonable of fact could have found that [Winkle] caused the death of [Victim]." Winkle's argument is based on the fact that his conviction was based on circumstantial evidence in that he asserts Cindy testified she did not actually see Victim when Winkle fired the shotgun, there was no evidence Winkle fired the third shot to Victim's head, and there was no evidence that the shotgun and spent shells found in the field were related to Victim's death.

Circumstantial evidence and permissible inferences therefrom generally are sufficient to support a conviction. *State v. Howery*, 427 S.W.3d 236, 245 (Mo. App. E.D. 2014). "Circumstantial evidence is evidence which does not directly prove a fact in issue, but gives rise

11

to a logical inference that the fact exists." *Id.* (quoting *State v. Fitzgerald*, 778 S.W.2d 689, 691 (Mo. App. E.D. 1989)). Circumstantial evidence is afforded the same weight as direct evidence by this Court. *State v. Hooper*, 552 S.W.3d 123, 134 (Mo. App. S.D. 2018).

Contrary to Winkle's assertion, the State presented sufficient circumstantial evidence for a reasonable juror to conclude Winkle caused Victim's death. Cindy testified that Winkle got "some type of long gun" from behind his seat and went to Victim's front door; the front door opened; Winkle raised the gun and shot. Cindy heard the shot "knock[] the breath out of" Victim. Winkle told Cindy he was going to go back and shoot Victim in the head before he got out of Cindy's truck and the two went separate ways. There was testimony that Winkle returned to the Chilton residence twice after separating from Cindy – evidence that he remained in the area of Victim's residence for some time. There was also evidence that Winkle had retrieved his shotgun from his vehicle after separating from Cindy in that he asked David to hide the weapon for him. Victim's body was found in the entrance, or front doorway, of his residence with three shotgun wounds. The gunshot to Victim's head occurred while Victim was lying down. Winkle was found in a field behind the Chilton's residence next door to Victim's house. Spent shotgun shells were found near Winkle and Winkle directed law enforcement to a shotgun. Forensic analysis determined the shot gun shells near Winkle were fired by the shotgun found in the field. Winkle confessed to Deputy Conley that he shot Victim. Victim's cause of death was determined to be shotgun wounds to Victim's head, chest, and abdomen. This circumstantial evidence, and inferences therefrom, is sufficient for a reasonable juror to find Winkle caused Victim's death and used a deadly weapon in doing so. *See State v. Mills*, 623 S.W.3d 717, 725 (Mo. App. E.D. 2021) (finding sufficient circumstantial evidence the appellant caused the victim's murder when the appellant's cell phone and shell casings were found near the victim;

12

shell casing was fired from a gun owned by the appellant's girlfriend and the appellant had access to; and the bullet was consistent with the gun, but not matched); *Hooper*, 552 S.W.3d at 137-38 (finding sufficient circumstantial evidence and inferences to support a finding the appellant caused the victim's death); *Howery*, 427 S.W.3d at 245 (finding sufficient circumstantial evidence for the jury to infer the appellant caused the death of the victim).

Winkle's circumstantial evidence argument focuses on evidence presented at trial that was contrary to the verdict instead of evidence and inferences in favor of the verdict. This argument ignores our standard of review. *See Hooper*, 552 S.W.3d at 136-37 (this Court denying the appellant's point on appeal asserting insufficient evidence when her argument ignored evidence and inferences favorable to the State and relied on evidence and inferences contrary to the verdict). In reviewing the sufficiency of the evidence, this Court ignores all evidence and inferences contrary to the jury's verdict. *Lehman*, 617 S.W.3d at 846-47. Although the trier of fact could have given more weight to the evidence Winkle relies on, it, in fact, seemingly chose not to do so. This Court does not reweigh the evidence on appeal. *Id.* at 846. Point II is denied.

### Conclusion

Winkle's points on appeal fail to comply with Rule 84.04(d), and Points I and III require dismissal. Despite Point II's deficiencies, this Court determines the State presented sufficient evidence to support Winkle's convictions. Point II is denied. Points I and III are dismissed. The trial court's judgment is affirmed.

JENNIFER R. GROWCOCK, C.J. – OPINION AUTHOR

JEFFREY W. BATES, J. – CONCURS

BECKY J.W. BORTHWICK, J. – CONCURS