

# Missouri Court of Appeals

## Southern District

### Division One

D.D.W.,[1]        )
           )
    Respondent,   )
           )
v.          )  No. SD36177
           )  Filed: February 13, 2020
M.F.A.,       )
           )
    Appellant.   )

### APPEAL FROM THE CIRCUIT COURT OF BUTLER COUNTY

Honorable John H. Shock, Judge

### AFFIRMED

M.F.A. ("Appellant") appeals from the trial court's "Judgment of the Full Order of Protection—Adult," issued in favor of D.D.W. ("Respondent"), pursuant to the Adult Abuse Act. *See* §§ 455.010-.090.[2] In three points on appeal, Appellant argues: (1) that there was insufficient evidence to support the trial court's finding that his conduct amounted to "stalking," (2) that there

---

[1] In accord with the directives of section 595.226 and the principles underlying it, we use initials for the parties, and exclude other identifying information as necessary.

[2] All references to statutes are to RSMo (2016), unless otherwise indicated. All references to rules are to Missouri Court Rules (2018).

was insufficient evidence to support the trial court's finding that his conduct amounted to "harassment," and (3) that the trial court's "grant[] [of] a full order of protection [was] without sufficient evidence or consideration of harm to Appellant." Appellant fails to demonstrate reversible error in any of his three points. We therefore deny the same, and affirm the judgment of the trial court.[3]

## Facts and Procedural Background

We recite the evidence and its reasonable available inferences in the light most favorable to the judgment. **Burke v. DeLay**, 583 S.W.3d 97, 98 (Mo.App. S.D. 2019). We include other information as necessary for clarity.

Appellant and Respondent were married for thirty-two years before divorcing on October 18, 2016. The record, as we must view it, reflects that the divorce decree designated that Appellant was "not supposed to be annoying [Respondent], harassing [her], [or] troubling [her] in any way[.]"[4] The couple had an adult son who "moved away . . . to get away" from the negative fallout from Appellant and Respondent's acrimonious relationship. Respondent did not initiate any contact with Appellant after the divorce decree was entered.

Respondent filed a "Petition for Order of Protection - Adult" against Appellant on May 10, 2019. The trial court entered an initial "Ex Parte Order of Protection - Adult" the same day, and Appellant was served the ex parte order of protection on May 11, 2019. A bench-tried hearing

---

[3] Respondent did not submit a brief. While there is no penalty for that omission, this Court is nevertheless forced to adjudicate Appellant's claims of error without the benefit of whatever arguments Respondent might have raised. **McClain v. Kelley**, 247 S.W.3d 19, 23 n.4 (Mo.App. S.D. 2008).

[4] The transcript reflects that the divorce decree was adduced as evidence at the underlying hearing in this matter. Appellant failed to include that document as part of the record in his instant appeal. It is the duty (and burden) of an appellant—as the moving party—to provide the reviewing court with a record containing all materials "necessary for determination of a question presented . . . for its review; and when an appellant fails to do so, the court will presume that the [materials] would have been unfavorable to the appellant." **Main v. Fariss**, 561 S.W.3d 104, 107 (Mo.App. S.D. 2018) (internal quotations and citation omitted); *see* Rule 81.12(a).

was held for a full order of protection on May 21, 2019, wherein Respondent appeared *pro se* and Appellant with counsel. The following evidence (as relevant here) was adduced:

•**Letters, Cards, Gifts, and Indirect Attempts at Contact**: After the parties were divorced, Appellant sent approximately six letters and cards (some to Respondent, some to Respondent and her family), to which Respondent gave no answer. On December 23, 2017, Appellant sent a gift to Respondent's home, which she immediately returned. "[W]ithin the last few weeks [before the hearing], [Appellant] contacted two people that [Respondent] kn[e]w, giving one of them a letter concerning [her]."

•**December 22, 2017**: At approximately 11:30 a.m., Respondent was at First Midwest Bank when she looked behind her and saw

> [Appellant]'s standing back, waiting on me. So he had stalked me into the bank. . . . And I tried to ignore him, and he said, 'Can we talk?' And I said, 'No.' And I continued to walk away and he said, 'Are you still mad at me?' And I shook my head 'No' and I continued walking. He followed me out of the bank, out to my vehicle. He had parked right next to my vehicle. And he stood in front of my vehicle with a paper and holding it. And . . . did tell him, 'Leave me alone,' were my exact words. And I said, 'or I am going to call someone, the police.' And I got into my vehicle and left.

•**May 3, 2019**: Appellant sent a letter to Respondent's home address. The same day, Respondent was putting gas in her car when she

> felt the presence of a vehicle right next to mine, on the driver's side. It was [Appellant]. So I went back out to 67, went back around, turned back in off of PP, back in the Mansion Mall. He was coming that way. He veered his vehicle over to try to get me to stop and I shook my head 'No' waved my hand 'No' and went past him to get gas.

•**May 11, 2019**: Respondent took her car to "Swafford's and was told she needed a new water pump:

> [I]t was going to take some time to install it and I walked over to Starbucks and I was going to get something to eat and I saw his vehicle headed north on 67. And I thought, well, that was kind of odd, but I thought that's just coincidence, maybe. And then I saw his vehicle go in front of Starbucks, and I moved down from where I was sitting and moved to the interior of the building, because I thought he might be going through the drive-through and I didn't want him to see me. And so, I just stayed inside the building. And in a little bit of time, he came inside the building and approached me immediately, got down and started pleading with me. And I told him, I said, 'I have a restraining order against you and you're not supposed to be here.' I said, 'I'm going to call the sheriff,' and he just stayed there.

3

And so, I called the sheriff immediately. And he hadn't received his restraining order yet, because I had just done that on Friday and this was Saturday. And so, anyway, I was very scared. And the dispatcher hung up with me, and then I called her back and said to please hurry, because he was right there at my feet. And he -- he said, 'I went next door and paid your bill over at Swafford's.' So he interfered with my business over there before coming to Starbucks looking for me.

And then he kept pleading and just -- just wanted me to talk to him. And the dispatcher asked me what he was wearing, et cetera. And then the deputies got there and the police got there -- there were three of them -- and the deputy gave him the restraining order papers there and went over what he was to do and not do. And two of the deputies left when we thought he left. Deputy Miles stayed behind with me for a while. And as Deputy Miles and I got ready to leave and exit Starbucks, I asked Deputy Miles, I said, 'Do you think you might should walk over to Swafford's with me and get the story of what happened over there with him interfering?' And then I looked ahead to the north and I saw his white Cadillac Escalade parked there still in the parking lot. And I said to Deputy Miles, I said, 'That looks like his vehicle there.'

And so, Deputy Miles walked ahead of me and we were both looking north, and as Deputy Miles got a little bit closer to the vehicle, [Appellant] walked up behind me and said, 'You don't have to ever worry about me bothering you again.' And I got kind of loud and I said, 'Leave me alone.' And Deputy Miles turned around and saw what was happening and he arrested him for breaking the order within 10 minutes.

•**Appellant's Past Threatening Behavior Toward Others**: In the past, Appellant had been fired from his job at a car dealership. Respondent's credited testimony reflected that she

sat and listened to [Appellant] talk about his homicidal ideations concerning two men that worked up there[.] But he didn't like those two guys. And he actually talked about two ways of killing those two men. . . . [O]ne was to drive his car through the plate glass window and then get the guns out of the safe up there and shoot those two men. And then the other idea he had was to be a sniper and literally pick those two men off from the parking lot when they were out there. . . . [H]e does have a restraining order . . . from [the car dealership].

On another occasion, Appellant told Respondent about "how he could do the most damage to [the] company" at which he was then employed: "And to do the damage he said what he could do would be to fly an airplane into their boiler room[.]"

•**Effect of Appellant's Actions on Respondent**: During their marriage, Respondent's doctor approved her absence from work for "approximately two and a half to three months

4

. . . to keep [her] away" from Appellant "because of [Appellant's behavior] and his craziness and his homicidal ideations[.]"

Respondent's credited testimony was that she was scared to even mow her lawn in fear of Appellant being "out there ready to pick me off[.]" She testified that she had started "pack[ing] a gun on me wherever I'm at just to keep safe[,]" and that she did not understand why Appellant "won't just leave me alone" and "not come around me."

•**Appellant's Mental Health:** Credited testimony was adduced that Appellant had "been in the psychiatric ward in St. Louis, in Cape[,]" and that he suffered from "major depression and anxiety."

Appellant testified in his own defense. He admitted he wrote a letter to Respondent telling her she had divorced him for "no cause," "[t]here was no infidelity on my part[,]" and that the "Bible says that you can be divorced under and she needs to know she did not follow that, that she divorced me without cause."

The trial court took the matter under advisement and issued its "Judgment of the Full Order of Protection - Adult" on the afternoon of May 21, 2019.

Appellant filed a "Motion to Re-Open or Amend Judgment or in the Alternative, for a New Trial," asserting that due to suffering from severe depression, he was unable to fully testify at the hearing, and in lieu thereof attached an affidavit. On June 25, 2019, after hearing argument, the trial court overruled Appellant's motion. This appeal follows.

Appellant challenges the trial court's judgment in three points[5] on appeal, to wit:

### POINT I

**THE TRIAL COURT ERRED IN GRANTING A FULL ORDER OF PROTECTION BECAUSE [APPELLANT]'S ALLEGED CONDUCT OF "STALKING" DOES NOT MEET THE DEFINITION UNDER THE ADULT ABUSE ACT.**

---

[5] We note there are numerous Rule 84.04 deficiencies in Appellant's brief, including 84.04(c) and 84.04(d). Specifically, we note that Appellant's points relied are deficient in their failure to "explain in summary fashion why, in the context of the case, those legal reasons support the claim of reversible error" as required by Rule 84.04(d)(1)(C). Compliance with Rule 84.04 is mandatory, and "[l]ack of compliance with requirements of Rule 84.04 amounts to failure to preserve issues for appellate review." *State v. Gray*, 230 S.W.3d 613, 620 (Mo.App. S.D. 2007) (internal quotation and citation omitted). We grant review *ex gratia*, but appellate counsel is cautioned to review Rule 84.04 before filing another appeal with this Court.

## POINT II

**THE TRIAL COURT ERRED IN GRANTING A FULL ORDER OF PROTECTION BECAUSE [APPELLANT'S] ALLEGED CONDUCT OF "HARRASSMENT" [sic] DOES NOT MEET THE DEFINITION UNDER THE ADULT ABUSE ACT.**

## POINT III

**THE TRIAL COURT ERRED IN GRANTING A FULL ORDER OF PROTECTION WITHOUT SUFFICIENT EVIDENCE OR CONSIDERATION OF HARM TO APPELLANT[.]**

(Underscore omitted).

### Standard of Review

"We review an order of protection the same as in any other court-tried case." ***N.J.D. v. R.O.D.***, 582 S.W.3d 116, 120 (Mo.App. E.D. 2019) (internal quotation and citation omitted). "[T]hat is, this Court will uphold the trial court's judgment as long as it is supported by substantial evidence, it is not against the weight of the evidence, and it does not erroneously declare or apply the law." ***Austin v. Jarred***, 578 S.W.3d 847, 849 (Mo.App. S.D. 2019) (internal quotation and citation omitted). "In reviewing the trial court's judgment, we consider the evidence in [the] light most favorable to the judgment and defer to the trial court's determination of credibility." ***Burke***, 583 S.W.3d at 98 (internal quotation and citation omitted). "It is appellant's burden (as the moving party) to overcome our presumption that the judgment of the trial court is correct." ***TracFone Wireless v. City of Springfield***, 557 S.W.3d 439, 445 (Mo.App. S.D. 2018).

### Analysis

#### *Point I: Substantial Evidence as to "Stalking"*

In his first point, Appellant claims that "the trial court erred in granting a full order of protection because [Appellant]'s alleged conduct of 'stalking' does not meet the definition under the Adult Abuse Act."

6

Appellant summarizes his argument as follows:

[Respondent] alleges that five letters, a postcard, a birthday card and a box of strawberries constitutes harassment. She further alleges that two face to face encounters within a fifteen-month span, constitutes stalking. Two meetings in a fifteen-month time period, in the town where [Appellant] resides could easily be happenstance. . . . As such, no allegation of stalking could be sustained.

*Ex gratia*, we curatively interpret this as a challenge that the trial court's full order of protection was not supported by substantial evidence. Nevertheless, this gratuity cannot salvage Appellant's first point, as fundamental defects doom his underling arguments in this vein. An appellant challenging that the trial court's judgment was not supported by substantial evidence must successfully complete the following distinct analytical steps:

(1) identify a challenged factual proposition, the existence of which is necessary to sustain the judgment;

(2) identify all of the favorable evidence in the record supporting the existence of that proposition; and,

(3) demonstrate why that favorable evidence, when considered along with the reasonable inferences drawn from that evidence, does not have probative force upon the proposition such that the trier of fact could not reasonably decide the existence of the proposition.

*Houston v. Crider*, 317 S.W.3d 178, 187 (Mo.App. S.D. 2010).[6]

Appellant's argument runs afoul in steps two and three. His argument fails to account for all of the evidence in the record supporting his challenged factual proposition, relies on evidence and inferences in his favor (which we disregard), and ignores evidence and inferences supporting the judgment (which we credit). In other words, Appellant fails to complete the:

most fundamental task in a [substantial] evidence challenge: to account for *all* of the favorable evidence in the record, and *all* the reasonable available inferences therefrom, that could support its challenged factual proposition, and then confront

_____

[6] *See* **Martinelli v. Mitchell**, 386 S.W.3d 148, 150 (Mo.App. S.D. 2012) (applying **Houston** to appeal from trial court's grant of order of protection).

and dispel the probative value attending the same supportive evidence and inferences.[7]

Appellant leaves this mandatory task undone, depriving his argument of any persuasive or analytical value. *See Houston*, 317 S.W.3d at 189.

"Finality of judgments is favored[.]" *Bate v. Greenwich Insurance Company*, 464 S.W.3d 515, 517 (Mo. banc 2015). The principles governing appellate review are consistent with this policy interest:

> (1) we presume the challenged judgment is correct; (2) we presume the trial court knows and applies the law; (3) we will affirm the outcome on any basis supported by the record; and (4) it is appellant's burden to dislodge us from the presumption that the outcome below was correct.

*Marck Indus., Inc. v. Lowe*, 587 S.W.3d 737, 743 (Mo.App. S.D. 2019) (internal quotations and citation omitted). Where, as here, the reviewing court must "sift through the record" to ascertain the merits (or not) of an appellant's arguments, the "effect" is that appellant's success depends on the reviewing court "assum[ing] the role of advocate." *Smith v. City of St. Louis*, 395 S.W.3d 20, 29 (Mo. banc 2013). This resort is prohibited, and we will not utilize it here. *Parker v. Doe Run Company*, 553 S.W.3d 356, 360 (Mo.App. S.D. 2018).

Appellant's first point fails to demonstrate that the trial court committed prejudicial error, and Point I is therefore denied.

### Point II: Substantial Evidence as to "Harassment"

In his second point, Appellant argues that "the trial court erred in granting a full order of protection because [Appellant]'s alleged conduct of 'harrassment' [sic] does not meet the definition under the Adult Abuse Act."

---

[7] *State v. Hooper*, 552 S.W.3d 123, 137 (Mo.App. S.D. 2018) (emphasis in original).

We observe that the corpus of the argument attendant to this point comprises a little over half a page (double-spaced), the substance of which reflects the following:

> [Respondent] never alleges that she ever gave [Appellant] an official request to discontinue communication. She states that she shredded the first 4 letters sent in 2016 and then kept the others. She never sent them back, "Return to Sender[.]" Repeated communication typically does not rise to the level of harassment and such conduct would not cause substantial emotional distress in a reasonable person.
>
> No abuse or emotional harm was proven. The Order should be reversed and the case dismissed.

(internal transcript citations and case citations omitted).

This argument shares the same fatal defects as Appellant's Point I argument (discussed *supra*), and must likewise fail for the same reasons. Point II is denied.

### Point III: Sufficiency of the Evidence and Alleged Lack of "Consideration of Harm to Appellant"

In his third point, Appellant argues that "the trial court erred in granting a full order of protection without sufficient evidence or consideration of harm to Appellant."

Again, the argument attendant to this point comprises a little over half a page (double-spaced). The underlying substance of this argument is as follows:

> This punitive measure [the challenged judgment] is inappropriate as [Appellant] did in no way, cause harm or threaten [Respondent] in any way. [Respondent] contends that 'Stalking is threatening.' Her definition of stalking is two chance encounters in a fifteen month time span. She further asserts that 'He should not be bothering me anyway.' [Respondent] never states in the record, that [Appellant] ever harmed her, or anyone else. She never stated that he threatened her. [She] never claimed he caused her emotional distress of any degree.

(internal transcript citations omitted).

In essence, this argument presents a generalized recitation of the same unavailing premises underlying Appellant's first and second points. For the same reasons we designate in our analysis of Appellant's Point I, his Point III must fail and is accordingly denied.

9

The judgment of the trial court is affirmed.

WILLIAM W. FRANCIS, JR., J. – OPINION AUTHOR

GARY W. LYNCH, P.J. – CONCURS

NANCY STEFFEN RAHMEYER, J. – CONCURS